246 So.2d 652

**ROYAL INDEMNITY COMPANY**

v.

**Lavetta R. PEARSON.**

**1 Div. 540.**

Supreme Court of Alabama.

March 25, 1971.

Cunningham, Bounds & Byrd, Mobile, for appellee.

John Douglas Richardson, Mobile, for appellant.

LAWSON, Justice.

This is an appeal from a judgment rendered in a garnishment procceding.—§ 1029, Title 7, Code 1940.

Lavetta Pearson sustained personal injuries when an automobile she was operating collided with a truck being driven by one Cleveland Moorer.

Subsequently a suit was filed by Lavetta Pearson to recover damages for the injuries she alleged she sustained in the accident. Named as defendants in that suit were The Merchants National Bank of Mobile, hereinafter referred to as the Bank; S. M. Adams, Inc., a corporation, hereinafter referred to as the Adams Company; Roche L. Smith and Cleveland Moorer. The complaint alleged, in effect, that Cleveland Moorer at the time of the accident was operating the truck as the agent, servant or employee of the other named defendants. That suit came on for trial before the court and a jury. At the conclusion of the plaintiff's evidence, the trial court granted a motion to exclude the evidence as to the defendant, the Adams Company, and at the conclusion of all the evidence the trial court, on request, gave the general affirmative charge with hypothesis in favor of the defendant Bank. The jury returned a verdict in favor of the plaintiff, Lavetta Pearson, against the defendants Roche L. Smith and Cleveland Moorer.

The judgment against Smith and Moorer not being satisfied, Lavetta Pearson caused a writ of garnishment to issue against Royal Indemnity Company, hereinafter sometimes referred to as Royal, which had issued a "Comprehensive Auto Liability Policy" to the Bank, which policy of insurance was in force on the day of the accident.

Royal filed an answer to the writ of garnishment wherein it alleged, in effect, that it was not indebted to either Smith or Moorer.—§ 1011, Title 7, Code 1940. Royal's answer concluded: "Said Garnishee reserves further the right to amend this answer, by leave of Court." Thereafter, the plaintiff, Lavetta Pearson, filed a contest of the answer.—§ 1020, Title 7, Code 1940. Royal filed a motion to strike the contest of the answer, which motion was denied. Thereupon Royal filed an instrument captioned "Additional Answer of Garnishee."

The issues were made up in the manner indicated. The garnishment proceeding was heard and submitted on stipulations

of fact, depositions and oral testimony taken before the court without a jury.

Prior to submission Royal requested a special finding of the facts as provided by § 262, Title 7, Code 1940.

Following the trial and the submission, the trial court made a special "Findings of Fact" and rendered a judgment in favor of Lavetta Pearson and against the garnishee, Royal, in the sum of $20,000, together with interest and costs.

Royal has appealed from that judgment to this court.

The right of Lavetta Pearson to proceed against Royal by way of garnishment was not questioned in the trial court and is not questioned here. See Macey v. Crum, 249 Ala. 249, 30 So.2d 666; Mattox v. Pennsylvania Threshermen and Farmers' Mut. Cas. Ins. Co., 276 Ala. 172, 160 So.2d 458; Southern Guaranty Ins. Co. v. Jones, 279 Ala. 577, 188 So.2d 537. Nor are we confronted on this appeal with any question concerning the pleadings or the manner in which the parties arrived at the issues.

Roche L. Smith at the time of the accident, September 23, 1965, was engaged in the business of cutting and hauling pulpwood from the woods to the paper mills. He used several trucks in his operation and employed several persons, including Cleveland Moorer.

The Adams Company was a pulpwood dealer at the time of the accident. It seems to have acted as the middleman between the paper mills and truck operators, such as Smith. It bought the wood and paid persons like Smith to cut and haul it. Charles Adams, the president of the Adams Company, knew Smith well. Smith had hauled pulpwood for the Adams Company for several years prior to the accident.

Charles Adams was well known to Theodore M. Reinhart, a vice-president of the Bank in charge of the Bank's installment loan department. The more

pulpwood trucks in operation, the more money Adams' company made. The Bank financed the purchase of trucks by persons who operated them in connection with the Adams Company. When such an operator defaulted on his payments to the Bank, Adams assisted the Bank in repossessing the truck, in selling it to another person, or in renting it. Adams was not paid by the Bank for his services. When asked if Adams received any "benefit or reward" for the services rendered the Bank, Reinhart replied: "Well that's rather a hard question to answer. The mutual agreement was that we handled his paper and he helped us out in cases like this." Reinhart talked with Adams at least once or twice a week.

Adams and Reinhart were both familiar with the truck which was involved in the accident. It was purchased new in 1963 by one Ray Matheny, who hauled pulpwood in it for Adams. The purchase was financed by the Bank. Matheny defaulted in his payments, so the Bank repossessed the truck. In May of 1964 Adams, on behalf of the Bank, negotiated a sale of the truck to N. A. Williams, who executed a chattel mortgage on the truck to the Bank. The truck was repossessed by the Bank in January of 1965. Reinhart asked Adams to dispose of the truck to the best advantage of the Bank. Adams, on behalf of the Bank, rented the truck to Ray Matheny, the original purchaser, who used it for an uncertain period of time in 1965 to haul pulpwood for Adams. Matheny abandoned the truck near the premises of the Adams Company and Charles Adams repossessed it for the Bank. Ultimately, Adams on behalf of Matheny paid the Bank the sum of $360 for the use of the truck, which was credited on the mortgage debt owed the Bank by Williams.

In September of 1965 Smith had a conversation with Adams in the latter's office. Smith told Adams he needed another truck. Smith and Adams are not in agreement as to everything that was said in that conversation. But they both

testified, in effect, that Adams told Smith, as Adams testified: " * * * that we had a truck that was on the corner of Telegraph Road and Paper Mill Road and for him to look at the truck and see if he thought that truck [truck involved in accident] would be satisfactory. * * and I told him to take the truck, to take it on to his house where he kept his other trucks." After that conversation, Smith instructed Cleveland Moorer to get the truck and have it checked by a mechanic. Later Moorer told Smith the truck was ready to go to the woods and drove the truck to his home and then began to use it in hauling pulpwood from the woods to the mills.

Adams testified that he told Smith in their conversation that if Smith hauled wood in the truck "that he was buying the truck." But Adams did not testify that he had ever discussed with Smith the price which the Bank wanted for the truck or the terms of payment.

Smith's testimony is to the effect that Adams did not tell him that if he hauled wood in the truck "he was buying it." He testified that he had the truck on a trial basis; that in their conversation Adams told him that if he decided to buy the truck to go to see Mr. Reinhart in that the truck belonged to the Bank; that he talked with Adams on Friday, September 17, 1965, and took possession the next day; that the truck was driven to the woods by Moorer on Monday, September 20th; that the truck was used in hauling wood two or three days before the accident on Wednesday, September 22, 1965, although it was "stuck in the woods one day"; that the truck performed very well, making about three deliveries of wood before the accident, but "it lacked a lot of being a new truck." Smith further testified that he did not tell Adams before the accident that he was going to buy the truck; that Adams didn't know he was buying the truck until Smith showed Adams a bill of sale to the truck

which he obtained from Reinhart a day or two after the accident.

Smith further testified that prior to the accident he had not discussed with anyone the price of the truck or the terms of a purchase and had not agreed with anyone to purchase the truck.

Adams testified that his conversation with Smith relative to the truck occurred on September 10, 1965, not on September 17, 1965; that Smith got the truck that day or the next and used it to haul pulpwood on September 13th, 15th, 16th, 17th and 21st of 1965 and on the 22nd, the day of the accident. Adams' testimony as to the days on which the truck was used by Smith was based on the records of the Adams Company that a truck with license tag No. 1388 hauled wood on those days, but it is admitted that the license tag on the truck which was involved in the accident bore the number 5H2–1387.

Both Adams and Reinhart testified that Adams had the authority from the Bank to allow a prospective purchaser to drive the truck. Reinhart did not restrict Adams as to the use to which a prospective purchaser could put the truck. But he did not expressly authorize Adams to permit Smith or his employees "to work this truck by going out into the woods and hauling paperwood."

At the time Adams told Smith to get the truck and try it out, Adams knew that Smith did not haul pulpwood himself but used employed drivers, including Cleveland Moorer. Adams placed no restrictions on Smith's use of the truck nor did he place any time limit as to the trial period.

In its "Findings of Fact" the trial court found the facts to be substantially as summarized above except it resolved the conflict between Adams and Smith in Smith's favor as to when Smith obtained possession of the truck through his employee, Moorer, and as to the length of time Smith used the truck prior to the accident. As to these matters the trial court

found: "Smith had Moorer, one of his regular drivers, pick up the truck on Saturday, September 18, 1965. Smith used the truck with Moorer driving it to haul pulpwood for two or three days before it was involved in this accident." The trial court made no reference in its "Findings of Fact" to Adams' testimony that he told Smith prior to the time Smith got possession of the truck that if he (Smith) "took the truck and started to haul wood with it, that he was buying the truck." While Smith did not in so many words say that Adams did not make that statement to him, his testimony concerning his conversation with Adams would justify a finding that no such statement was made by Adams.

▆▆▆ Although the action of the trial court in making a special finding of the facts as provided in § 262, Title 7, Code 1940, does not prevent this court from reviewing such a finding, nevertheless, in our review we indulge the usual presumption in favor of a trial court's finding of facts based on oral testimony given by witnesses in its presence. It has been said in a case where the trial court made a special finding of facts, as in this case, that this rule of review is founded upon sound principle applicable alike to general or special findings.—Sovereign Camp, W. O. W. v. Hubbard, 217 Ala. 431, 116 So. 163. This court has said on several occasions that a finding of facts made by a trial court when testimony is taken orally, or partly so, before the court will not be disturbed on appeal unless palpably wrong.—Mitchell v. Kinney, 242 Ala. 196, 5 So.2d 788; Aiken v. Barnes, 247 Ala. 657, 25 So.2d 849; Ingalls v. Ingalls, 257 Ala. 521, 59 So.2d 898.

We have read the evidence with much care and agree with the trial court's findings in respect to the conflict in the testimony of Adams and Smith. Certainly we cannot say that the trial court's findings in that regard were palpably wrong when it was in a position to observe the witnesses as they testified.

One of the basic issues for determination in this case is who was the owner of the truck Cleveland Moorer was operating at the time of the accident in which Lavetta Pearson was injured.

The trial court concluded from its "Findings of Fact" that:

"A. There was no sale or contract of sale, relating to the truck, between Smith and the Bank, or its agents, prior to the accident.

"B. The truck, at the time of the collision with Pearson's vehicle, was a vehicle owned by the Bank within the terms of the policy of insurance. In this connection it is to be noted that the definition of 'owned auto' is not limited to vehicles named therein."

Royal, the appellant, if we correctly understand its brief, does not question the fact that the Bank acquired legal title to the truck when it repossessed it in January of 1965 under the terms of a chattel mortgage which the Bank held on the truck, nor do we understand the Bank to take the position that it was not the owner of the truck at the time it came into the possession of Smith in September of 1965. Nor do we understand Royal to take the position that the truck was not covered by the insurance policy here involved simply because the truck was not described in that policy.

But Royal does strenuously insist that the trial court erred in concluding that there was no sale or contract of sale relating to the truck between Smith and the Bank, or its agents, prior to the accident. In support of its argument Royal seems to place much emphasis upon Adams' testimony to the effect that he told Smith that if he hauled wood in the truck he was buying it. As we have indicated, Smith's testimony tends to deny that such a statement was made by Adams and the trial court, in our opinion, was fully justified in making no reference to it in its "Findings of Fact."

▆▆▆ This court has said that while actual delivery is of great importance in

determining whether there was an intention to pass title, it is by no means conclusive on the question of the passing of title. Hamm v. Continental Gin Company, 276 Ala. 611, 165 So.2d 392. See State v. Mobile Stove & Pulley Mfg. Co., 255 Ala. 617, 52 So.2d 693.

Under the Uniform Sales Act (Code 1940, Title 57, § 1 et seq.), which has been repealed but was in effect at the time of the transactions here involved, the passing of title between a seller and a buyer depends upon the intention of the parties.—Hyatt v. Reynolds, 245 Ala. 411, 17 So.2d 413; Hamm v. Continental Gin Co., *supra*.

In our opinion, the facts as found by the trial court, which are fully supported by the evidence, establish that Smith had the truck in his possession for the purpose of trying it out to see if he wanted to purchase it and at the time of the accident he had not agreed to purchase it. We do not understand how Reinhart could have considered the truck sold when neither the sales price nor the manner of payment had been determined. Likewise, Smith testified he did not think he had bought the truck until after he talked with Reinhart, which was after the accident, and at which time the sales price and manner in which it was to be paid was agreed upon and Smith was given a bill of sale.

Prior to the accident Smith had contacted no one with the Bank relative to purchasing the truck. He had not communicated to the Bank that he desired to buy the truck. He had not communicated to Adams that he desired to purchase the truck. He had not discussed the sales price of the truck with the Bank or Adams. He had not discussed the terms of the sale with the Bank or with Adams. Smith had not, under the finding of the trial court, retained the vehicle for an unreasonable length of time.

A sale could have taken place without delivery or payment provided those essential elements had been agreed upon by both parties so that nothing remained to be done but a compliance with the agreement. But in this case one of the essential elements of a sale, payment, had not even been discussed by the prospective purchaser and the prospective seller at the time of the accident.

██ Under the facts and circumstances of this case, we entertain the view that since the terms of sale had not been considered or discussed prior to the accident, the trial court was justified in holding that there was no sale. We hold that title to the truck was in the Bank on the day of the accident.

Having determined that title to the truck was in the Bank on September 22, 1965, the date of the accident, it is necessary to decide which of the various coverage provisions of the insurance policy, if any, were applicable at the time the truck was involved in the accident.

We quote some pertinent provisions of the policy:

"INSURING AGREEMENTS

"1. Coverage A—Bodily Injury Liability

"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the ownership, maintenance or use of any automobile.

\*      \*      \*      \*      \*      \*

"III. Definition of Insured [Omnibus Clause]

"The unqualified word 'insured' includes the named insured and also includes any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or *with his permission*, and any executive officer of the named insured with respect to the use of a non-owned

automobile in the business of the named insured * * *." (Emphasis supplied)

* * * * * *

## CONDITIONS

* * * * * *

"3. Automobiles Defined, Trailers, Private Passenger Automobiles, Two or More Automobiles

"(a) Automobile. Except where stated to the contrary, the word 'automobile' means a land motor vehicle or trailer as follows:

"(1) Owned Automobile—an automobile owned by the named insured;

* * * * * *

Lavetta Pearson took the position in the trial court that at the time of the accident Moorer, as Smith's agent, was driving the truck with the permission of the Bank and consequently Moorer and Smith were afforded coverage under the so-called omnibus clause of the insurance policy issued by Royal to the Bank. Royal, of course, took the contrary position.

On this question the trial court concluded from the evidence that "Smith and Moorer, as a permittee of a permittee, had permission of the named insured, the Bank, to operate the vehicle and, therefore, each was an 'insured' within the Omnibus Clause of the policy."

■ Where, as here, only "permission" is required in the omnibus clause, we have followed the general rule to the effect that "permission" is sufficient to provide coverage to the user if the facts justify a finding that either express or implied permission has been granted by the named insured.— Alabama Farm Bureau Mut. Cas. Ins. Co. v. Robinson, 269 Ala. 346, 113 So.2d 140; Harrison v. Densmore, 279 Ala. 190, 183 So.2d 787; American Mutual Liability Ins. Co. v. Milwaukee Ins. Co. of Milwaukee, 283 Ala. 414, 218 So.2d 129; Pettis v. State Farm Mut. Auto. Ins. Co., 286 Ala. 344, 239 So.2d 772. But where the words "express permission" are used in the omnibus clause, the burden is on the user to establish that he was driving with the *express* permission of the named insured.—Alabama Farm Bureau Mut. Cas. Ins. Co. v. Government Employees Ins. Co., 286 Ala. 414, 240 So.2d 664; Alabama Farm Bureau Mut. Cas. Ins. Co. v. Mattison, 286 Ala. 541, 243 So.2d 490.

The evidence shows beyond peradventure that Smith had the express permission of the Bank to try out the truck before making a decision as to whether he wanted to buy it. He got that permission from Adams who we think the evidence clearly shows was an agent for the Bank in the transaction with Smith, with full authority to turn the truck over to Smith for the purpose stated above.

Adams' authority clearly extended to the point of authorizing Smith to permit one of his employees to do the actual testing of the truck. The Bank had placed no limitations on Adams in regard to his authority to dispose of the truck to the Bank's best advantage. If Adams did not expressly authorize Smith to have one of his employees test the truck, there is evidence more than ample to show that Smith had Adams' implied permission to do so. Adams testified to the effect that Smith did not drive pulpwood trucks. When he authorized Smith to try out the truck, Adams knew the testing would be done by one of Smith's employees.

As shown above, the trial court found from the evidence that Smith and Moorer had permission of the Bank to operate the truck, but the court did not expressly conclude or find that such permission extended to the date of the accident and the manner in which the truck was being used at the time of the accident. But such is the effect of the court's action in holding that Smith and Moorer were "each an 'insured' within the Omnibus Clause of the policy" and in rendering a judgment in favor of Lavetta Pearson against Royal, the Bank's insurer.

We are confronted with the question as to whether the evidence supports such a

conclusion, that is, that Smith had permission of the Bank to use the truck to haul pulpwood at the time of the accident. The evidence does not show that Smith had the express permission of the Bank through Adams or anyone else to so use the truck.

So the question arises as to whether the evidence supports a conclusion that Smith had the implied permission of the Bank to haul pulpwood from the woods to the mills at the time of the accident

■ We think this question must be answered in the affirmative. The truck was specially equipped to haul pulpwood. It had been used for that purpose by at least two other persons over a period of many months. Smith was familiar with the truck to some extent but not with its capability to perform adequately for the purpose for which he needed it. He was not merely interested in whether the motor would run or whether it could be safely driven around a city block. After having been put to the rough use, the wear and tear, to which a pulpwood truck is necessarily subjected, for many months, it is only reasonable to infer that Smith wanted to know if the body of the truck and the special equipment thereon was still capable of hauling pulpwood from the woods to the mills and it is only reasonable to infer that Adams, being peculiarly familiar with the pulpwood business, expected Smith to test the truck from the woods to the mills. Adams was in touch with Smith. He knew Smith was using the truck to haul pulpwood. He did not try to stop him. The trial court apparently gave no credence to Adams' testimony to the effect that he told Smith that if he used the truck to haul pulpwood he had bought it. Under the singular facts and circumstances of this case, we feel that Smith had the implied permission of the Bank through Adams to use the truck to haul pulpwood at the time of the accident.

At the time of the accident, there was attached to the insurance policy which Royal had issued to the Bank a "Repossessed Automobiles" endorsement, which in pertinent parts provided:

"It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability * * * with respect to an owned automobile applies with respect to any automobile while being repossessed by the named insured, or while being maintained or used in connection with resale following such repossession, subject to the following provisions:

\*     \*     \*     \*     \*     \*

"2. Exclusion. This endorsement does not apply to any automobile while being used for other business purposes or for personal, pleasure or family purposes.

\*     \*     \*     \*     \*     \*

In the "Additional Answer of Garnishee," Royal, after setting out the provisions of the endorsement just quoted above, alleged:

"Your Garnishee avers that at the time the automobile was being allegedly driven by Cleveland Moorer, an agent, servant or employee of Roche L. Smith, the said motor vehicle was being used for other business purposes or was being used for personal, pleasure or family purposes and was thus excluded under the terms of the aforementioned policy."

As to this defense interposed by Royal, the trial court held: "E. There is no necessity of interpreting the 'Repossessed Automobiles' Endorsement dated 4/29/65 attached to the policy under the circumstances of this case."

There was no contention made in the trial court that the truck which Cleveland Moorer was operating at the time of the accident had not been repossessed by the Bank in January of 1965. The accident occurred on September 22, 1965. In the briefs filed by the parties to this appeal it is conceded that the truck had been repossessed by the Bank in January of 1965.

■ The record does not disclose why the trial court held that there was no ne-

cessity of interpreting the "Repossessed Automobiles" endorsement in this case. No doubt it was for the reason that the trial court considered that such endorsement had no application to a motor vehicle which had been repossessed approximately nine months prior to the accident and had become an "owned automobile," as those words are defined in the policy of insurance, to such an extent that it had been rented out by the Bank for some time following repossession and prior to the accident. The trial court was confronted with the task of deciding whether the provisions of the policy which relate to "owned automobiles" or the provisions of the "Repossessed Automobiles" endorsement should determine the question of coverage of the truck at the time of the accident under the facts and circumstances of this case. The effect of the trial court's holding that there was no necessity to interpret the "Repossessed Automobiles" endorsement was tantamount to a holding that the provisions of that endorsement have no application to the facts of this case. We agree. In so holding the trial court merely followed the rule that ambiguous insurance policies are construed against the insurer and in favor of the insured. Trans-Continental Mutual Ins. Co. v. Harrison, 262 Ala. 373, 78 So.2d 917.

Royal took the position in the trial court that it should not be required to pay the judgment in favor of Lavetta Pearson and against Smith and Moorer, even if they be considered as additional insured under the omnibus clause of the policy, because Smith and Moorer both breached the following provisions of the policy which appear under the heading "Conditions":

"9. NOTICE OF ACCIDENT

"When an accident occurs written notice shall be given by *or on behalf of the insured* to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstanc-

es of the accident, * * * (Emphasis supplied)

"10. NOTICE OF CLAIM OR SUIT

"If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative."

In pertinent part Condition 12 of the policy here involved reads:

"12. ACTION AGAINST COMPANY

"No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

*  *  *  *  *  * "

In its brief Royal points out that Bill Boynton, its claims manager, testified that neither Smith nor Moorer forwarded "any suit papers or notice of the accident" to Royal, nor did either of them call upon Royal to defend them in the suit brought by Lavetta Pearson, although the Adams Company did make such a request.

Royal is correct. Boynton did testify as shown above. But Boynton also testified, in substance, that the named insured, the Bank, notified Royal's agent in Mobile of the accident by sending to it a copy of the complaint which was duly transmitted to Boynton, along with a "lost notice" or "accident report form"; that when he received a copy of the suit papers he determined that Smith and Moorer had been sued as well as the Bank; that Royal never took the position that the Bank had not complied with Conditions 9 and 10 of the policy; that Royal, through an independent adjuster, made an investigation of the acci-

dent, contacting and obtaining statements from Charles Adams, president of Adams Company, and Smith and Moorer; that Royal's attorneys notified the Bank, Charles Adams, Smith and Moorer that Royal had determined that the Bank was the only defendant in the Pearson case which it would defend, although the Adams Company had requested a defense by Royal; that if Smith and Moorer had requested a defense by Royal the request would have been denied; that, in his opinion, "our attorney" notified Smith and Moorer that the policy issued by Royal to the Bank afforded no coverage to either of them; that after the decision had been made not to defend Smith and Moorer "he didn't have anything to do with what defense they brought up or any obligations that they might have made; that he didn't believe that 'this delay' hindered him in any way in his investigation"; that from the standpoint of the Bank he was able to do a good investigative job.

In regard to Royal's contention that it should not be required to pay the judgment against Smith and Moorer because of their failure to comply with Conditions 9 and 10 of the policy, the trial court found:

"5. Royal received notice of said accident in time to allow it to fully and adequately investigate the accident, and after receiving such notice, did investigate the accident, such investigation being in no way prejudiced by any delay between the time of the accident and the time it received notice thereof.

"6. A copy of the Complaint filed by Pearson in the above referred to case was timely delivered to Royal by the Bank.

"7. Royal, after receiving the copy of said Complaint and after investigation, denied coverage under the policy, determined that it would not defend Smith and Moorer in said action and directed its attorneys to represent only the Bank in said action."

It is the settled law of this state that as between the named insured and the insurer, the failure of the named insured to give a reasonably timely notice of the accident or of the receipt of any demand, notice, summons or other process to the insurer will release the insurer from obligations to the named insured, although no prejudice may have resulted to the insurer, where notice of the accident and the forwarding of such papers are specially made a condition precedent to any action against the insurer. American Fire & Cas. Co. v. Tankersley, 20 Ala. 126, 116 So.2d 579.

But we are concerned in this case with the failure of the additional insureds to comply with the provisions of Conditions 9 and 10 of the subject policy relative to giving of notice and the forwarding of papers to the insurer.

Counsel have not called to our attention any Alabama adjudication, and our research has disclosed none, which deals with the necessity of an additional insured to comply with provisions such as those contained in Conditions 9 and 10.

Counsel for appellee have called to our attention three cases decided by other courts. Of the cases cited, that of Indemnity Insurance Co. of North America v. Forrest, 9 Cir., 44 F.2d 465, is nearest in point. In that case Indemnity relied in part on the defense that the additional insured failed to forthwith forward to Indemnity the process and pleadings which had been served on him. But there was testimony tending to prove that the process and pleadings served on the named insured had been promptly forwarded to Indemnity. This was held to be a sufficient compliance with the requirements of the policy in regard to the forwarding of process and pleadings to the insurer.

The other two cases cited in brief of appellee, although not directly in point, are supportive of the action of the trial court presently under consideration. See Jameson v. Farmers Mut. Auto. Ins. Co., Inc., 181 Kan. 120, 309 P.2d 394; Kuc v. Mill Owners Mut. Ins. Co., 7 Cir., 309 F.2d 728.

In Helvy v. Inland Mut. Ins. Co., 148 W.Va. 51, 132 S.E.2d 912, 917, it was said:

"Notice of loss given by the *named insured* to the insurer within one week after the accident occurred in which the plaintiff was injured *constituted sufficient compliance with a policy requirement that when an accident occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable*, and there was no necessity for Walker Trucking Company, the lessee of the insured automobile involved in the accident, *as an additional insured under the omnibus clause of the policy, to give any additional notice to the insurer*; and its failure to give an additional notice as soon as practicable after the occurrence of the loss did not relieve the insurer of its liability under the terms of the policy." (Emphasis supplied)

In National Surety Corp. v. Wells, 5 Cir., 287 F.2d 102, an automobile liability insurance policy contained a provision requiring notice of loss by the insured similar to that contained in the policy in the case at bar. The father of a sixteen-year-old high school student was the named insured. The automobile of the insured, while driven by his son with the consent of the insured, was involved in a collision which resulted in property damage and personal injury to persons who subsequently instituted actions against the insured and his son. The insured gave immediate notice of the accident to the insurer and it proceeded to investigate the case and in its investigation interviewed and obtained a written statement from the son. With respect to those facts, the opinion in that case contained this language:

"* * * Up to this time the Insurer knew everything it possibly could have known had Junior [the son], not Senior [the father], been the instigator of the notice. There had, therefore, been literal, full, substantial and complete compliance with policy requirements of notice of the occurrence." (287 F.2d 104)

See Knudson v. Anderson, 199 Minn. 479, 272 N.W. 376; MacClure v. Accident & Cas. Ins. Co. of Winterthur, Switzerland, 229 N.C. 305, 49 S.E.2d 742.

We are in accord with the holding of the cases cited above which in our opinion fully support the action of the trial court in holding, in effect, that Royal cannot avoid liability under the subject policy simply because Smith and Moorer did not comply with the provisions of Conditions 9 and 10 of the policy in view of the compliance with those provisions by the Bank, the named insured, and the subsequent interrogation by Royal's agents of Smith and Moorer.

There are cases from other jurisdictions which, under facts which we think are distinguishable from those in the case at bar, have come to a contrary conclusion. See Velkers v. Glen Falls Ins. Co., 93 N.J.Super. 501, 226 A.2d 448, aff'd, 98 N.J.Super. 166, 236 A.2d 408; American Southern Ins. Co. v. England, D.C., 260 F.Supp. 55, aff'd in part and reversed in part in England v. American Southern Ins. Co., 4 Cir., 380 F.2d 137.

Royal contends that there can be no liability on its part because of the failure of Smith and Moorer to assist and cooperate with Royal with the defense of the former suit, as specified in Condition 11 of the policy, which we see no occasion to set out.

As to this contention the trial court found:

"8. There was no evidence that Smith or Moorer failed to cooperate with Royal in connection with the defense of the suit, although they never called on Royal to furnish them attorneys, and other attorneys did represent them in said action."

That finding by the trial court is supported by the evidence in every respect.

The "Additional Answer of Garnishee" filed by Royal contains averments designed

to show that the verdict and judgment in favor of the Bank in the suit brought by Lavetta Pearson against the Bank, the Adams Company, Smith and Moorer "is res judicata on this Honorable Court."

The trial court held that the "verdict and judgment" in that case "is not res judicata of the issues involved in this proceeding."

A plea of res judicata should show that the parties are the same, the subject matter the same, and that the judgment was upon the merits. Yancey v. Denham, 211 Ala. 138, 99 So. 851.

We doubt that the so-called plea of res judicata set up in the "Additional Answer of Garnishee" meets those requirements. But we lay that question aside, for we are convinced that Royal did not meet the burden which was on it to show that the issues in the former suit were broad enough to cover the issues in this case. Bowman v. Bowman, 274 Ala. 498, 150 So.2d 385; Yancey v. Denham, *supra*.

The issue involved in the former suit (Pearson v. The Bank et al.) was not the same as the issues involved in this garnishment action. The verdict in favor of the Bank decided that Moorer was not the agent of the Bank at the time of the accident. It did not decide that Moorer was using the truck without the permission of the Bank.—Vezolles v. Home Indemnity Co., New York, D.C., 38 F.Supp. 455, aff'd Home Indemnity Co., New York v. Vezolles, 6 Cir., 128 F.2d 257. See Foote v. Grant, 56 Wash.2d 630, 354 P.2d 893. Nor did the former suit decide that Moorer at the time of the accident was using the truck "for other business purposes" within the meaning of the exclusion clause in the "Repossessed Automobiles" endorsement, which clause we have quoted above. By making this last observation we do not want to be understood as withdrawing from the position which we have taken that the trial court did not err in saying that there was no need to interpret that endorsement under

the circumstances of this case. Those "circumstances" showed that the truck was an "owned automobile" at the time of the collision in September of 1965. The repossession occurred in January of that year.

The judgment of the trial court is affirmed.

Affirmed.

HEFLIN, C. J., and MERRILL, HARDWOOD and MADDOX, JJ., concur.