650 A.2d 285

**CLINICAL PERFUSIONISTS, INC.**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY.**

Misc. No. 15, Sept. Term, 1994.

Court of Appeals of Maryland.

Dec. 9, 1994.

686

Thomas McCarthy, Jr. (McCarthy & Dernoga, on brief), Annapolis, for appellant.

Kathryn D. Kirmayer (Richard McMillan, Jr., Andrew H. Marks, Crowell & Moring, all on brief), Washington, DC, for appellee.

Catherine A. Potthast and Jessica S. Schaffer, Smith, Somerville & Case, Baltimore, for amicus curiae Saint Joseph Hospital, Inc.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, CHASANOW, BELL and RAKER, JJ, and JOHN F. McAULIFFE, Judge of the Court of Appeals (retired), Specially Assigned.

RODOWSKY, Judge.

This is an insurance case. It presents trigger of coverage issues under a form of claims made, medical profession, liability policy that is the subject of a declaratory judgment action in the United States District Court for the District of Maryland. The federal court (Frank A. Kaufman, J.) has certified to us four progressively more complex questions.[1] Basically, two health care providers, insured under different policies

---

1. The questions are certified pursuant to the Maryland Uniform Certification of Questions of Law Act, Maryland Code (1974, 1989 Repl.Vol.), §§ 12–601 through 12–609 of the Courts and Judicial Proceedings Article.

issued by the same insurer, participated in a surgical operation. Shortly thereafter the patient died, prompting one insured to give notice of a potential claim to the insurer. The other insured did not notify the insurer until suit was filed, after its policy had expired. We conclude, based on the particular facts set forth below, that coverage was not triggered under the policy of the non-notifying insured.

The plaintiff in the federal action is Clinical Perfusionists, Inc. (CPI). Through its technicians CPI provides perfusion services for open heart surgery at various hospitals, including St. Joseph Hospital, Inc. (the Hospital). "Perfusion" is the process whereby a patient's blood is oxygenated and recirculated through the use of a heart-lung "pump" machine, thereby bypassing the patient's heart and lungs during the surgical procedure. CPI was insured under professional liability policy No. 508JD3817 (the Policy), issued by St. Paul Fire and Marine Insurance Company (St. Paul), the defendant in the federal action. The Policy period was September 1, 1986 through September 1, 1987, with a retroactive date of September 1, 1985. CPI did not renew the Policy.

The Policy, in relevant part, provides:

"**Important note:** This is a claims-made coverage. Please read it carefully, especially the When A Claim is Covered section.

. . . .

"**When A Claim Is Covered**

"We'll cover claims that result from the professional service you performed or should have performed after the retroactive date that applies. We must also be notified of the claim while this agreement is in effect.

"**When We'll Consider A Claim Made**

"We'll consider a claim is made on the date you first report an incident or injury to us or our agent. You must include the following information:

● Date, time and place of the incident;

- What happened and what professional service you performed;
- Type of claim you anticipate;
- Name and address of injured party; and
- Name and address of any witness.

. . . .

## "WHAT TO DO IF YOU HAVE A LOSS

. . . .

### "Someone Is Injured Or Something Happens Which Can Result In A Liability Claim

"If an accident or incident occurs that may involve this policy, you or any other protected person involved must:

. . . .

"2.   Tell us or our agent what happened as soon as possible. Do this even though no claim has been made but you or another protected person is aware of having done something that may later result in a claim.   This notice should include:

- The time and place of the event;
- The protected person involved;
- The specific nature of the incident including the type of claim that may result;   and
- The names and addresses of any witnesses and injured people." [2]

On December 16, 1986, Paul Trionfo underwent coronary artery bypass surgery at the Hospital.   Physicians participating in the procedure were the surgeon, assistant surgeon, and the anesthesiologist, Dr. George V. George.   The perfusionist was employed by CPI.   Mr. Trionfo never regained consciousness following the surgery, and he died on December 29, 1986 of anoxic encephalopathy.   Sometime thereafter Dr. George

---

**2.**   The Policy also provided for an optional extension of coverage which CPI did not purchase.   The optional coverage would have applied to:
   "• Injuries or deaths that occur after the retroactive date and before that date this agreement ends.   And
   "• Claims that are first made or reported to us after the ending date of this agreement and before the reporting endorsement ends."

had a telephone conversation with his insurance broker to whom Dr. George subsequently wrote a letter dated February 13, 1987. That letter was forwarded to St. Paul, which insured Dr. George against professional liability under Policy 508JA6877.

Dr. George's letter advised that the patient had been cooled to 29.5° C, the bypass performed, and the patient rewarmed to 36.8° C. The aorta cross clamp was then released and Mr. Trionfo's heart spontaneously started to beat.

Dr. George further reported as follows:

"One of the anastomoses was unsatisfactory and so [a]ortic cross clamp was re-applied 10:44 A.M. at a body temperature of 36.8 degrees C. Surgical conditions were unsatisfactory and hence the [s]urgeon requested the [p]erfusionist to reduce blood flow to about two litres, which is less than half [the flow] that was optimal. His mean blood pressure decreased to about thirty mm, which could not be raised by pharmacological means. Surgeon was informed of this, but due to the difficulty in anastomosis, this condition had to be maintained for about fourteen minutes."

Dr. George concluded by stating that

"[w]e used standard anesthesia care and at no time was [the patient's] pressure or oxygenation below levels except when the perfusion flow was decreased by the [p]erfusionist to subnormal levels at the request of the [s]urgeon."

Dr. George did not mention CPI in his letter. Nor did he identify the individual who was performing the perfusion service.

St. Paul assigned an adjuster to investigate. The adjuster conducted a recorded question and answer interview of Dr. George, and that recording was transcribed. The perfusionist was not identified in that interview. The adjuster obtained the 371 page medical record on Mr. Trionfo from the Hospital. Within that record there is a chart on which are recorded various readings by the perfusionist at various times in the course of the surgery. That chart has a preprinted heading

reading, "Clinical Perfusionists, Inc. Cardiopulmonary Bypass Record."

In addition to investigating the possible liability of Dr. George to the survivors of Mr. Trionfo, the adjuster, on an internal form called the "TEN–DAY REPORT," was asked to opine on "Subrogation, Indemnity, or Contribution." The adjuster inserted, "Hospital & Surgeon." In a memorandum of May 6, 1987 to the Baltimore branch office claims supervisor, the adjuster stated "that the primary exposure would rest with the surgeon," and advised that the surgeon was insured with Medical Mutual "and is believed to have a $3,000,000.00 limit." The adjuster further believed "that our insured [*i.e.*, Dr. George] would be second in line followed by" the Hospital, which the adjuster believed was also insured by Medical Mutual. The Baltimore claims office reported to the regional and home offices of St. Paul that "[w]e insure only the anesthesiologist...." A report of late May to the home office from the regional claims supervisor for St. Paul recognized that "[i]f a claim is made, there would be a shotgun approach by the family...."

St. Paul also caused Mr. Trionfo's record from the Hospital to be reviewed by another anesthesiologist who concluded that the case was "handled flawlessly" by Dr. George. St. Paul determined that it would close its file if no claim were asserted against Dr. George by August 1987.

Mr. Trionfo's survivors filed a wrongful death action in December 1989. Included among the defendants are CPI, Dr. George, and the Hospital. In January 1990 CPI notified its insurance agent of the Trionfo lawsuit, and the agent reported that filing to St. Paul a few days later. Prior to the filing of the wrongful death action no claim had been made against CPI by Mr. Trionfo's survivors or his estate. St. Paul denied coverage, contending that no claim had been made during the Policy period. The federal declaratory judgment action followed.

Thus, although the bypass surgery giving rise to alleged tort liability on the part of CPI occurred during the Policy

period, no claim was asserted by the Trionfo family against CPI during the Policy period, and CPI did not report a potential Trionfo claim to St. Paul during the Policy period. But for (1) the report by Dr. George to St. Paul of a potential claim under his policy and (2) St. Paul's resulting investigation, this case would be controlled by *T.H.E. Ins. Co. v. P.T.P. Inc.*, 331 Md. 406, 628 A.2d 223 (1993). There we held that the notice-prejudice rule of Md.Code (1957, 1991 Repl.Vol.), Art. 48A, § 482 does not operate to enlarge the insuring agreement in a claims made policy so as to cover a claim arising out of an occurrence that took place within the policy period when the claim was neither made nor reported during the policy period.[3]

The questions certified by the federal court are:

"1. Under the terms of the policy at issue in this case, in order for a claim or potential claim to be considered 'made,' or in order for coverage of that claim to be considered 'made,' or in order for coverage of that claim or potential claim to be provided, must the insured CPI report the claim or potential claim to St. Paul, or can a third party report that claim or potential claim?

"2. If a third-party report is permissible, in the context of the facts in this case, was the scope of the information provided by George in his notice of a potential claim suffi-

---

**3.** CPI asserts that "[t]he St. Paul policy *sub judice* shares the same ambiguity found by this Court in" *St. Paul Fire & Marine Ins. Co. v. House*, 315 Md. 328, 554 A.2d 404 (1989). Brief of Appellant at 18. In *House*, a claim had been made by the claimant against the insured while the policy was in effect, but the claim was not reported to the insurer until after the policy had expired, when the insured was served with the claimant's suit. The policy involved in *House* could be read to provide coverage under those circumstances for the claim made by the tort claimant. Here, there was no claim made by Mr. Trionfo's family against CPI during the Policy period. Further, the language of the Policy avoids the ambiguity present in the *House* type of policy by providing that St. Paul "must also be notified of the claim while this agreement is in effect." The comparable clause in the *House* policy read: "The claim must also first be made while this agreement is in effect." *House*, 315 Md. at 334, 554 A.2d at 407.

cient to constitute a third-party report of CPI's claim as well?

"3. If, prior to the expiration of CPI's policy period, St. Paul discovered, through its own efforts or as a result of the notice given it by George, the existence of CPI's policy and the fact of CPI's participation in the Trionfo surgery, does that suffice to require St. Paul to insure CPI from claims or potential claims arising from the Trionfo incident?

"4. If St. Paul was not timely informed of the existence of the CPI policy, did St. Paul have the obligation to check its records in order to determine whether any participants in the Trionfo surgery other than George were insured under policies issued by St. Paul?"

We interpret the first two of these questions as focusing on the report by Dr. George and the remaining two questions as focusing on the St. Paul investigation.

## I

We shall assume, *arguendo*, that the answer to question one is "yes," *i.e.*, that a third person to the insurer-insured relationship who is not acting as an agent for the insured, may trigger coverage by reporting to the insurer a potential claim against the insured. It is unnecessary to answer question one because the scope of the information actually provided by Dr. George in his notice of a potential claim against himself was not sufficient to constitute a third party report of a potential claim against CPI under the Policy. For example, it is unnecessary to opine whether the Policy would have covered the Trionfo claim against CPI upon St. Paul's receipt of Dr. George's letter if, contrary to the facts presented, Dr. George had included in his letter that the perfusionist for the bypass surgery was CPI and that CPI was also insured by St. Paul for professional liability. But Dr. George's letter of February 13, 1987 in fact implicates only the policy issued to him by St. Paul; the letter does not implicate policy 508JD3817 issued by St. Paul to CPI.

CPI cites many cases involving occurrence policies where a third party to the insurer-insured relationship reported the occurrence to the insurer. None of the cases cited, however, concerned a claims made policy. They can be grouped into three areas. First, cases involving occurrence policies allowing notice "by or on behalf of" the insured: *State Farm Mut. Auto. Ins. Co. v. Sloan,* 150 Ga.App. 464, 258 S.E.2d 146 (1979); *Stonewall Ins. Co. v. Farone,* 129 Ga.App. 471, 199 S.E.2d 852 (1973); *Monguso v. Pietrucha,* 87 N.J.Super. 492, 210 A.2d 81 (1965). Second, where notice by one insured was sufficient as to an additional insured on the same occurrence policy: *Hartford Accident & Indem. Co. v. Strain Poultry Farms, Inc.,* 166 Ga.App. 334, 303 S.E.2d 781 (1983); *Mariani v. Bender,* 85 N.J.Super. 490, 205 A.2d 323 (1964), *cert. denied,* 44 N.J. 409, 209 A.2d 143 (1965); *Philadelphia Elec. Co. v. Aetna Casualty & Sur. Co.,* 335 Pa.Super. 410, 484 A.2d 768 (1984); *Sinclair Oil Corp. v. New Hampshire Ins. Co.,* 107 R.I. 469, 268 A.2d 281 (1970); *Helvy v. Inland Mut. Ins. Co.,* 148 W.Va. 51, 132 S.E.2d 912 (1963). Lastly, where notice by a third party on an occurrence policy allowed for sufficient investigation so as not to prejudice the insurer: *Royal Indem. Co. v. Pearson,* 287 Ala. 1, 246 So.2d 652 (1971); *Lee v. Travelers Ins. Co.,* 184 A.2d 636 (D.C.1962); *Olivieri v. Coronet Ins. Co.,* 173 Ill.App.3d 867, 124 Ill.Dec. 95, 528 N.E.2d 986 (1987), *cert. denied,* 124 Ill.2d 556, 129 Ill.Dec. 151, 535 N.E.2d 916 (1989); *Gregory v. Highway Ins. Co.,* 24 Ill.App.2d 285, 164 N.E.2d 297 (1960); *Cousins v. Liberty Mut. Ins. Co.,* 47 Misc.2d 413, 262 N.Y.S.2d 760 (N.Y.Sup.Ct.1965), *aff'd,* 26 A.D.2d 992, 276 N.Y.S.2d 839 (N.Y.App.Div.1966); *Bailey v. Universal Underwriters Ins. Co.,* 258 Or. 201, 474 P.2d 746 (1970).

The instant matter is distinguishable from those involving occurrence policies. The promise of St. Paul is, in general, to insure against liability for actual claims made that are reported within the Policy period and for potential claims that are reported within the Policy period. The threshold purpose of reporting to the insurer in a policy of this type is to effect, or trigger, coverage under the insured's policy. *See T.H.E. Ins.*

*Co.,* 331 Md. 406, 628 A.2d 223. Investigation of the incident giving rise to the potential claim ordinarily is temporally secondary to the reporting of the claim. Under the facts of the case before us Dr. George's letter, in and of itself, did not advise St. Paul that there was a potential claim against CPI by the Trionfo family that potentially fell within the Policy.

Both CPI and St. Paul take relatively extreme positions on the content required for a notice to effect coverage. CPI seems to contend that it was unnecessary for St. Paul to be aware of its policy issued to CPI when it received Dr. George's notice, and that notice of the incident alone was sufficient. On the other hand, St. Paul contends that the report of a potential claim must contain information on each of the topics referred to in the Policy in order to be effective as a trigger of coverage. In our view a more sound approach is the middle ground taken in *St. Paul Fire & Marine Ins. Co. v. Tinney,* 920 F.2d 861 (11th Cir.1991).

*Tinney* involved a claims made, medical profession, liability policy. It provided that "[a] claim is made on the date you first report an incident or injury to us or our agent." *Id.* at 862. The policy then listed the information to be contained in the notice. The list is identical to that in the Policy.[4] The policy expired on September 4, 1987. While it was in effect the insured, Torsch, performed surgery on three patients, Green, Willis, and McLeod, each of whom became clients of the same attorney, Tinney. In March 1987 Tinney sent a claim letter to the insured on behalf of all three clients, but Tinney's letter was not forwarded to the insurer at that time. Tinney filed suit on behalf of Green in May 1987, at which time the suit papers, a copy of the attorney's earlier letter, and a loss notice referring only to Green's claim were sent to the insurer by the insurance agent for the insured. After the policy expired suits were filed against the insured on behalf of

---

**4.** The answer to the question, "When is a claim made?" in the *Tinney* form of policy is the same as the answer in the policy involved in *House,* 315 Md. 328, 554 A.2d 404. Other provisions of the policy involved in *Tinney* are neither set forth nor discussed in the opinion.

Willis and McLeod. St. Paul denied coverage for the latter claims because the listed background information had not been furnished as to those claimants prior to policy expiration.

The court held that the attorney's letter, transmitted within the policy period in connection with the suit by Green, was a sufficient notice of the claims by Willis and McLeod. The court reasoned as follows:

> "We would be hard pressed to find a stronger statement of the likelihood of litigation against Torsch for medical malpractice than is contained in Tinney's letter of March 26, 1987, which was brought to the attention of St. Paul. The provision of the policy calling for background information was to assist St. Paul in the investigation of the claims so that St. Paul could either settle or prepare to defend litigation. This information, while helpful to the insurer, cannot be used as a trap for the unwary insured. *Once the insurer is put on notice that there has been an incident, together with the essential facts upon which liability of the insurer depends, a claim is made.* If there is a deficiency of investigative information called for by the policy (not pertinent to the underlying question of liability), the insurer may require it to be furnished. Should the insured unreasonably fail or refuse to provide the information sought, the insurer may have the right to deny liability, if it has suffered prejudice in not being able to properly investigate the claim."

*Id.* at 863 (emphasis added).

In the instant matter Dr. George's letter did not advise St. Paul of the essential facts upon which its contractual obligations to CPI depended. Indeed, the insurer-insured relationship between CPI and St. Paul was not expressly or implicitly referred to in the letter.

The same deficiency afflicts Dr. George's letter as supplemented by St. Paul's receipt of the Hospital record on Mr. Trionfo, even though the record contained at one place among its hundreds of pages a reference to CPI as the perfusionist.

For these reasons, assuming *arguendo* that the answer to question one is "yes," the answer to question two is "no."

## II

Question three in essence asks whether coverage would be triggered if St. Paul "discovered" CPI's policy and CPI's participation in the Trionfo surgery. The term "discovered" requires some refining.

After St. Paul obtained the Hospital record, that insurer, within the universe of its corporate being, possessed information that Mr. Trionfo had died following surgery, that the anesthesiologist had reported a potential claim against him, that another participant in the surgery, the perfusionist, was CPI, that CPI was an insured, and that any suit arising out of the incident likely would be of the "shotgun" variety as to parties defendant. It might be said that, in this way, St. Paul had knowledge of the potential claim against another insured, CPI. But some of this information was in a claim file, opened under Dr. George's policy, other information was likely among policyholder, agency, or accounting records, and still other information was a matter of judgment based on legal procedure and claims experience. Knowledge by St. Paul, in the above-described sense, does not satisfy that aspect of the Policy's coverage trigger that St. Paul "must also be notified of the claim while this agreement is in effect." By merely possessing knowledge in the above-described way, St. Paul had not "discovered" the interrelation between the incident and the Policy.

Question three raises the issue of whether coverage can be triggered by the insurer's discovery, from any source, of information that is the substantial equivalent of an effective notice from the insured. Question three is broader than question one in that question three includes information developed by the insurer itself, in addition to information furnished by a third party. In analyzing question three we shall again assume, *arguendo*, that it is not essential for the insured

personally to participate in the giving of notice to the insurer in order to trigger coverage.

We interpret "discovered" in question three to mean "awareness." Awareness has two aspects, the person who is aware and the information of which that person is aware. In general, the requisite information should reveal a potential claim to which a particular policy potentially applies. The person in the insurer's organization who must be aware of the triggering information is necessarily one who has the authority to decide whether and to what extent to conduct an investigation of the potential claim, or one who is under a duty to the insurer, as employer, to report that information to one who does have that authority. Further, coverage triggering information necessarily includes awareness by the insurer of participation by the insured in the incident that generates potential liability. In the instant matter there is no evidence of the actual coalescence in one person of both aspects of awareness.

■ Thus, the issue raised by question three, as we interpret it, is not factually presented. The Maryland Uniform Certification of Questions of Law Act does not oblige us to render purely academic opinions. *See Hamilton v. Verdow,* 287 Md. 544, 570 n. 10, 414 A.2d 914, 928–29 n. 10 (1980).

## III

■ The factual premise underlying question four is that St. Paul had not discovered the existence of the CPI policy. The question asks whether St. Paul had the "obligation" to check its records to determine whether any participants in the Trionfo surgery, other than Dr. George, were insured by St. Paul. We interpret "obligation" to mean a duty running from St. Paul to CPI to identify CPI as an insured involved in the Trionfo surgery, even though CPI had not identified itself to St. Paul as involved in the Trionfo surgery. We distinguish the "obligation" referred to in question four from any duty that the St. Paul adjuster or claims supervisors owed to St. Paul to identify potential sources of contribution or indemnity.

We also distinguish the "obligation" referred to from any duty owed by St. Paul to CPI to identify potential sources of contribution or indemnity if CPI, within the Policy period, had notified St. Paul of a potential Trionfo claim or of a claim actually asserted by the Trionfo family.

Further we interpret "obligation" in question four to mean a duty that carries result-determinative consequences for its nonperformance. Under the uniform act invoked by the federal court, "this Court may answer questions certified to it if the questions 'may be determinative of the cause then pending in the certifying court.'" *United States v. Searle*, 322 Md. 1, 6, 584 A.2d 1263, 1265 (1991) (quoting Md.Code (1974, 1989 Repl.Vol.), § 12–601 of the Courts and Judicial Proceedings Article). An example of such an obligation in the circumstances of this case might be a duty for the breach of which state law attributed to St. Paul that knowledge that St. Paul would have obtained had the duty been performed, so that declaratory judgment, specific performance, and/or damage remedies against St. Paul might be available to CPI.

In the instant matter there is no direct evidence that the St. Paul adjuster who was investigating the potential claim against Dr. George ever became aware, from any source, that the perfusionist was a St. Paul insured. In an amicus brief the Hospital draws the inference that the adjuster mistakenly assumed that the perfusionist was an employee of the Hospital. In any event, on the record before us, the St. Paul claims personnel apparently believed that Dr. George was the "only" St. Paul insured involved in the surgery.

CPI argues that "[i]f St. Paul failed to discover that CPI was a St. Paul insured, and that it therefore had potential liability under the CPI insurance policy, St. Paul cannot claim that Dr. George's notice was insufficient for the purpose of secondary coverage to CPI under the terms of the CPI insurance policy." Brief of Appellant at 35. In support of this argument CPI reviews two cases, both of which involve co-insureds under occurrence, liability policies. Under those policies coverage attached when the occurrence took place,

and the concern in the cases was over whether coverage was lost by the insured's failure timely to notify the carrier.

The first of the CPI-emphasized decisions is *Philadelphia Elec. Co. v. Aetna Casualty & Sur. Ins. Co.*, 335 Pa.Super. 410, 484 A.2d 768 (1984). It involved an Aetna liability policy purchased by a contractor pursuant to its road construction contract for the benefit of a utility on whose land the contractor would be working. In 1966 an employee of the contractor was injured and claimed workers' compensation, which Aetna also insured. While the compensation claim was pending the worker sued the utility in tort based on the same occurrence, and, as apparently permitted by Pennsylvania practice, the utility, in November 1966, impleaded the employer-contractor for indemnity. In 1975 the utility concluded that it was an insured under the liability policy issued to the contractor. Aetna denied coverage. The court held that the employer's notice to Aetna of the claim by the utility, and the insurer's defense of that claim, were sufficient to defeat the insurer's contention that the utility lost coverage by breach of the notice provision in the liability policy.

The court relied on *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193 (1977), in which the Pennsylvania Supreme Court had adopted a notice-prejudice rule that is similar in operation to Md.Code, Art. 48A, § 482. This Court discussed *Brakeman* in *T.H.E. Ins. Co.* where we noted that the United States Court of Appeals for the Third Circuit, applying Pennsylvania law, concluded that the *Brakeman* analysis was inapplicable to the claims made policy there involved. *T.H.E. Ins. Co.*, 331 Md. at 420, 628 A.2d at 230. This was because "[t]he notice provision in a claims made policy 'provides a certain date after which an insurer knows that it no longer is liable under the policy, and accordingly, allows the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty.'" *Id.* (quoting *City of Harrisburg v. International Surplus Lines Ins. Co.*, 596 F.Supp. 954, 962 (M.D.Pa.1984), *aff'd*, 770 F.2d 1067 (3d Cir.1985)).

The second case reviewed by CPI is *Sinclair Oil Corp. v. New Hampshire Ins. Co.,* 107 R.I. 469, 268 A.2d 281 (1970). It involved a comprehensive general liability policy that included automobile liability. A truck driver, employed by the policyholder, was injured by the snap back of a valve release cord when the truck was being loaded with kerosene by a supplier. The driver sought workers' compensation, a coverage furnished to the employer by the same insurer on the liability risk. Two years after the accident, when the employee sued the supplier, the supplier contended that the employer's policy also insured the supplier because permissive use of the vehicle included loading. The court held that the insurer's notice of the accident through the workers' compensation claim prevented disclaimer of coverage for the occurrence under the liability policy. 268 A.2d at 285.

Neither of these cases is authority for the existence of a duty owed by St. Paul to CPI to identify all potential defendants that might be involved in a potential Trionfo claim and to determine which potential defendant, if any, other than Dr. George, might be insured under a different policy from that which St. Paul had issued to Dr. George.

In its amicus brief the Hospital seeks to underpin the contention that there is a duty from St. Paul to CPI with the legal theories of estoppel or Good Samaritan. The Hospital cites *Medical Mut. Liab. Ins. Soc'y v. Miller,* 52 Md.App. 602, 451 A.2d 930 (1982), where the Court of Special Appeals affirmed a finding in a declaratory judgment action that the insurer was estopped to disclaim coverage based on the insured's breach of the cooperation clause. There the insurer had undertaken preparation of the defense of a medical malpractice claim for a physician who had falsified records purportedly demonstrating informed consent. The insurer did not disclaim until eleven months after the insured had "conceded that there was no defense to the informed consent, that he was 'zapped' on that issue, and that he never referred [the patient] to the form on the initial visit; nor did he at any time tell her of any of the complications." *Id.* at 612, 451 A.2d at

935. *Cf. Fidelity & Casualty Co. v. McConnaughy*, 228 Md. 1, 9, 179 A.2d 117, 121 (1962) (insurer not estopped from disclaiming for breach of cooperation clause where disclaimer made nine days after insured admitted attempting to suborn perjury).

In the case before us, St. Paul's undertaking of an investigation on behalf of Dr. George cannot raise an estoppel against it to deny that CPI's coverage was triggered. During that investigation St. Paul was not aware that CPI was an insured involved in the Trionfo surgery, and CPI in no way relied on St. Paul's investigation of the occurrence as indicating that coverage had been triggered for the benefit of CPI.

■ Alternatively, the Hospital contends that negligent performance by St. Paul of its duty to investigate on behalf of Dr. George gives rise to an obligation imposed by law to CPI. The most analogous legal rule tending to support this argument is the Good Samaritan doctrine recognized in Restatement (Second) of Torts § 324A (1965).[5] This Court referred to, and paraphrased, § 324A in a footnote in *Brady v. Ralph M. Parsons Co.*, 327 Md. 275, 282 n. 2, 609 A.2d 297, 300 n. 2 (1992), where we said that the rule applies "[u]nder some circumstances." *See E.G. Rock, Inc. v. Danly*, 98 Md.App. 411, 423–24, 633 A.2d 485, 491 (1993). *Brady v. Ralph M. Parsons Co.* was a personal injury case. By its terms, the rule of Restatement § 324A applies only to "physical harm" to "a third person or his things." Even if St. Paul's conduct

---

5. Restatement (Second) of Torts, § 324A reads:

"Liability to Third Person for Negligent Performance of Undertaking

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

were within the ambit of § 324A, the harm to CPI is exclusively economic loss. Extending the rule of § 324A to include economic loss is a can of worms which we leave sealed. *Cf. United States Gypsum Co. v. Baltimore*, 336 Md. 145, 156–58, 647 A.2d 405, 410–11 (1994) (tort recovery permitted for economic loss based on a defective product where the defect creates a substantial and unreasonable risk of death or personal injury); *Council of Co–Owners Atlantis Condominium v. Whiting–Turner Contracting Co.*, 308 Md. 18, 32–35, 517 A.2d 336, 344–45 (1986) (defective construction—same).

Of the cases to which we have been referred, or which our research has disclosed, the most pertinent is *National Union Fire Ins. Co. v. Baker & McKenzie*, 997 F.2d 305 (7th Cir. 1993), *aff'g sub nom. National Union Fire Ins. Co. v. Bauman*, No. 90–C–0340, 1992 W.L. 1738 (N.D.Ill.1992). The litigation involved a claims made or reported policy issued to the law firm of Baker & McKenzie (the Baker firm) for the period July 15, 1987 to July 15, 1988. The Baker firm had 899 lawyers, all of whom were listed in the application for the relevant policy. Among these were three attorneys who formerly were members of a Dallas firm that had represented a defunct Texas savings and loan association that had been absorbed by a predecessor of the Federal Deposit Insurance Corporation (FDIC). By letter dated September 9, 1987, the FDIC made claim against all of the attorneys who had practiced at the Dallas firm during its representation of the thrift. The insurer was not notified of the FDIC letter by the three attorneys or by the Baker firm. Between July and September of the policy year an attorney employed by the insurer had received the application for insurance from the Baker firm and, from sources other than the Baker firm, a copy of the FDIC September 9 letter and copies of other demands made on attorneys formerly practicing with the Dallas firm and relating to its legal representation of the savings and loan. When the FDIC sued in March 1990, the insurer denied that coverage for the three Baker firm partners had been triggered. In the resulting policy litigation the Baker firm contended that the insurer had timely notice "albeit not from the

insureds." 997 F.2d at 309. The Seventh Circuit affirmed a rejection of this contention, saying:

> "[The insurer's attorney] Seaman had documents from which it could be inferred that a claim would eventually be made under the Baker & McKenzie policy. But to have drawn this inference Seaman would have had to read and memorize all 899 names in Baker & McKenzie's application for insurance so that months later when he saw the names of the three lawyers in letters from another National Union insured the proverbial light bulb would have lit up in his brain. It is true that the policy does not require that the notice of claim (or event giving rise to a potential claim) come from the insured, and at argument National Union's lawyer conceded that if the FDIC had sent its notice of claim directly to National Union this would have satisfied the reporting requirement. But it does not follow that the requirement is satisfied by demonstrating that a sophisticated system of computerized data and retrieval might have enabled National Union through collation of documents from different sources to form an informed judgment that it was likely someday to receive a claim from Baker & McKenzie. It is far easier for the insured to lick a postage stamp.... The requirements are clear and easy to comply with and nothing in the policy waived their application to this case."

*Id.*

For the foregoing reasons, the answer to question four is "no."

*CERTIFIED QUESTIONS ANSWERED AS ABOVE SET FORTH. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.*