STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, A CORPORATION AUTHORIZED TO DO BUSINESS IN NEW JERSEY, PLAINTIFF-RESPONDENT, v. ESTATE OF DARRELL JEROME SIMMONS AND ESTATE OF DARRELL RICHARD-SON, DEFENDANTS, AND ESTATE OF MICHAEL BLANCHE DAVIS, ESTATE OF HENRY MICHAEL, AND ESTATE OF RALPH CURTIS ROBINSON, DEFENDANTS-APPELLANTS.

Argued February 20, 1980—Decided July 25, 1980.

George R. Hardin argued the cause for appellant Estate of Ralph Curtis Robinson (*Conway, Reiseman, Bumgardner, Hurley & Kleinfeld*, attorneys).

Dennis A. Drazin argued the cause for appellant Estate of Michael Blanche Davis (*Drazin & Warshaw*, attorneys; *Thomas J. DiChiara*, on the brief).

*Michele Donato* argued the cause for appellant Estate of Henry Michael (*Anschelewitz, Barr, Ansell & Bonello*, attorneys).

*Michael J. Cernigliaro* argued the cause for respondent (*Campbell, Foley, Lee, Murphy & Cernigliaro*, attorneys).

The opinion of the court was delivered by

HANDLER, J.

This is an appeal from a declaratory judgment that an automobile liability insurance policy, issued in Alabama by an Alabama insurance carrier to an Alabama domiciliary who was then serving in the armed forces and stationed temporarily in New Jersey, did not cover five of the insured's fellow servicemen who were killed in New Jersey while riding in the insured's automobile. The case requires this Court to decide whether the law of Alabama or that of New Jersey should resolve the questions necessary to determine coverage. This entails a reconsideration of the choice-of-law principles articulated in *Buzzone v. Hartford Accident & Indemnity Co.*, 23 *N.J.* 447 (1957).

I

The essential facts are not in dispute. David Allen Hays, a domiciliary of Montgomery, Alabama, had in September 1974 enlisted in the United States Marine Corps and had been assigned in February 1975 to the Earle Naval Ammunition Depot ("Earle") in Colts Neck, New Jersey. Hays, who was single, maintained his Alabama home with his mother and spent leaves at home in Alabama. He intended to return to Alabama after his military service. In the Spring of 1974, while still in high school, Hays had purchased a 1964 Chevrolet Impala in Alabama and had obtained in Alabama an automobile liability policy with State Farm Mutual Insurance Company ("State Farm" or "insuror"). He paid the insurance premium in full, although his mother "signed for it." He apparently renewed the policy by mail in April 1975. When he first came to Earle, he did not bring his car with him to New Jersey. Later, however, he went

to Alabama on a four-day pass and returned to the base with his car, which he kept in the parking lot of his barrack.

On May 20, 1975, at about 11:00 a. m., Darrell Simmons, a fellow Marine whom Hays knew fairly well, asked Hays if he could borrow Hays' car to drive to a nearby bank to cash his paycheck. Although he had never loaned his car previously to Simmons, Hays agreed. Simmons told Hays that he would be using the car "just long enough to get his check cashed and he'd be right back," to which Hays responded that he planned to use the car later when he completed his duty. Simmons understood that he was to come "straight back . . . and give [Hays] the keys back." Simmons, however, had not returned with the automobile by noon, at which time Hays had to begin a four-hour "phone watch" duty. Simmons failed to return the automobile or its keys during Hays' four-hour watch, so when Hays completed his watch at 4:00 p. m., he went to each parking lot on the base looking for his car and inquired unsuccessfully as to whether anyone had seen Simmons. Hays eventually returned to his quarters where he slept until about the time for his next scheduled watch. That evening from midnight until 4:00 a. m., Hays again had duty, this time, "fire watch." While patrolling on duty, Hays discovered his car was parked "across from headquarters in front of the Powder Keg," a nightclub which catered to enlisted men. He observed the club's patrons, including Simmons, exiting the nightclub and, although leaving his post was a court martial offense, Hays walked toward his parked car. Simmons and five other Marines, among them the four named decedents, however, reached the car before Hays did. Simmons, in fact, was already in the driver's seat when Hays approached the vehicle.

Hays no less than three times directed Simmons to return the car keys to him; Simmons, refused, telling Hays "he wasn't going to give them back." Ralph Robinson, one of the Marines, also asked Simmons to return the car keys to Hays and Simmons again refused. When Hays explained that he had promised to drive Robinson to visit Robinson's wife the next morning, Simmons continued to refuse to surrender possession of the car and

replied that he, not Hays, would drive Robinson. Another Marine in the group threatened Hays, warning him that if Hays were not standing in the open next to the car, "he'd whip [Hays]." Hays did not consider this an idle threat and "was not going to test [the marine]." At this time several women were also in the parking lot and the Marines unmistakably expressed a group wish to "see [those] girls . . . over in Red Bank." Hays, armed only with a nightstick, considered the number of and intoxicated condition of the Marines and decided that he could neither overpower them singlehandedly nor prevent them from taking his vehicle. The women then departed and the Marines followed them in Hays' car. Hays returned to his post. Hays was "pretty much upset"; he apparently believed that his car had been wrongfully withheld from him since he had then decided to report the theft of the car if it were not returned in the morning.

At 4:00 a. m., Hays finished his watch, returned to his barrack, and went to sleep. Within an hour, however, he was awakened by the corporal of the guard who informed him that his car had been wrecked. At 3:40 that morning, on Sycamore Avenue in Tinton Falls, New Jersey, Hays' car with Darrell Simmons driving crashed into a tree. All five occupants—Simmons, Robinson, Michael Davis, Henry Michael, and Darrell Richardson—were killed in the accident.

Claims under the State Farm insurance policy were made on behalf of the decedents. State Farm subsequently sought a declaratory judgment in New Jersey that, under the circumstances surrounding the use of the car at the time of the fatal crash, the policy issued to Hays did not extend coverage to Simmons and his four passengers. Hays was the only person to testify at trial. Applying the substantive law of Alabama, the trial judge found for State Farm on the issue of coverage. An appeal was taken by several of the defendant-claimants and the Appellate Division, also applying Alabama law, affirmed the holding of the trial court. 169 *N.J.Super.* 133, 140 (App.Div. 1979). The appellate court further noted, however, that even if New Jersey law were to be applied, the result as to coverage

would be the same. *Id.* at 138. This Court granted appellants' petition for certification. 81 *N.J.* 348 (1979).

II

The Appellate Division agreed with the trial court that the substantive law of Alabama governed the dispute and that, under Alabama law, Simmons had neither express nor implied consent from Hays to use the car at the time of the accident. 169 *N.J.Super.* at 138. Our analysis thus begins with the threshold determination of the choice of law to be applied in resolving the controversy presented in this case.

The leading case in New Jersey dealing with choice-of-law principles in insurance policy controversies is *Buzzone v. Hartford Accident & Indemnity Co.*, 23 *N.J.* 447 (1957). Plaintiffs in that case had been in an automobile accident in New Jersey and sought to collect an unsatisfied judgment obtained in New Jersey from the driver's insuror, a Connecticut insurance corporation. *Id.* at 450. The driver, a New York resident, had obtained the Connecticut policy in New York by giving a false name and presenting a phony New York driver's license bearing that name; his actual New York license in his true name had previously been revoked. *Ibid.* The policy contained a standard conforming clause which provided that the insurance contract would be deemed to be in compliance with the motor vehicle financial responsibility law of any state with respect to any liability arising from the operation of the vehicle in that state. *Id.* at 450–451.

The Court in *Buzzone* commenced its analysis by stating the basic principle that, in the interpretation of a contract, the law of the place where the contractual obligation was made ordinarily governs, as distinguished from tort cases, in which the law of the place of the wrong usually controls the determination of the rights and liabilities of the parties. *Id.* at 452. The Court characterized the case before it as involving the determination of obligations under a contract and thus ruled that, in light of all of the circumstances, the basic rule governing the choice of law in contract actions should be followed. *Ibid.* Applying that

rule, the Court concluded that the law of New York should be applied and that under New York law the insurance company was entitled to plead the defense of fraud to avoid coverage. *Id.* at 457.

Petitioner in the instant case contends that this Court's analysis in *Buzzone* with respect to the appropriate principles governing conflicts of law is outmoded in light of current developments. Modern approaches follow the "most significant relationship" standard of the *Restatement (Second) of Conflict of Laws* § 188 (1971) (hereinafter *Restatement*) and the "governmental interest" test utilized in several recent New Jersey tort cases. It is argued that under these approaches the law of New Jersey should be applied in this case and that, under our law, Simmons would have been covered as an insured under the insurance policy at the time of the fata: cident.

We disagree that the appropriate choice-of-law standard dictates the application of New Jersey law under the circumstances of this appeal and hold that the courts below correctly followed the law of Alabama to determine insurance coverage.

The *Restatement* conflict-of-law standard in contract actions has been denominated the "most significant relationship" test. *Restatement, supra,* § 188. The *Restatement* identifies seven general considerations germane to a court's conflict-of-law analysis, *viz.*: (1) the needs of the interstate and international system, (2) the relevant policies of the forum, (3) the relevant policies of other affected states and the relevant interests of those states in the determination of the particular issue, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability, and uniformity of result, and (7) ease in the determination and application of the law to be applied. *Restatement, supra,* § 6.

The significant relationship test focuses upon that state which has the most meaningful connections with the transaction and the parties in issue. It calls for an "evaluat[ion] according to their relative importance" of several relevant "contacts," such as the domicile of the parties and the places of contracting and

performance. *Restatement, supra*, § 188. These important contacts become relevant in the assessment of those basic considerations which determine ultimately the choice of law—the policies and interests of affected states, the special concerns which underlay the particular field of law, the protection of reasonable expectations, the needs for uniformity and consistency, and the ease in the selection and application of the appropriate law. *Restatement, supra*, § 6, § 188.

With specific reference to casualty insurance policies, including those providing collision insurance, the *Restatement* propounds the following general principle:

> The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and parties, in which event the local law of the other state will be applied. [*Restatement, supra*, § 193.]

While not expressed in the terms of the *Restatement*, our decision in *Buzzone* is not inconsistent with this approach and the result there can be perceived as resting upon some of the factors considered important in the *Restatement*. The Court in *Buzzone* in effect considered the significant relationships of each state to the transaction and the parties, *e. g.*, the domicile of the parties, the place of contracting, its anticipated place of performance, and location of the subject matter. It weighed these contacts in the broader context of the reasonable expectations of the contracting parties concerning the principal location of the insured risk and the governmental interests and legislative policies of each affected state. It also recognized the need for reasonable certainty and consistency in choice-of-law principles and the importance of discouraging forum-shopping. Thus, although the Court in *Buzzone* initiated its analysis by recognizing the law of the place of contracting as the choice-of-law rule in a contract case, the Court gave appropriate emphasis to the significant relationships of the respective states to the parties and the underlying transaction.

Cases in this jurisdiction subsequent to *Buzzone* have not mechanically or inflexibly applied the *lex loci contractus* rule. See, *e. g., Public Service Coordinated Transport v. Marlo Trucking Co., Inc.,* 108 *N.J.Super.* 232, 236 (App.Div.1970) (when insurance contract was made in New York and driver, attorney, and company's principal place of business are all in New York, New York law governs even though accident occurred in New Jersey). Rather, our courts have generally acknowledged, in the selection of state law, the relevance of respective state interests in the particular resolution of the controversy measured by several factors including the connection of the parties to the respective states, the nature of pertinent events that have transpired within each state, and the character of each state's policy preferences relevant to the particular litigation. For example, in *Kievit v. Loyal Protective Life Ins. Co.,* 34 *N.J.* 475, 492–493 (1961), a suit upon an insurance contract involving competing state interests, the Court found that New Jersey had a greater concern in the controversy and the suit's outcome than did Massachusetts, although the result in that particular case would not be different regardless of which law were to be applied.

This Court has invoked a "governmental interest" test in a series of tort cases presenting conflict-of-law problems. *E. g., Pfau v. Trent Aluminum Co.,* 55 *N.J.* 511, 521 (1970), (automobile accident in Iowa involving a Connecticut passenger and a New Jersey driver of vehicle registered in New Jersey; Iowa has insufficient interest in having its strict guest-host law applied); *Mellk v. Sarahson,* 49 *N.J.* 226, 229 (1967) (suit for personal injury arose from Ohio automobile accident in which parties were New Jersey residents; New Jersey guest-host law applied, permitting the suit, rather than Ohio's law barring such actions; application of Ohio law would not further that state's interest when parties are no longer in Ohio); see generally Comment, "The Application in New Jersey of Government Interest Analysis Approach to Choice-of-Law Problems of Tort Liability," 3 *Rut.-Cam.L.J.* 165 (1971). While simple conflict-of-law rules in the tort area, such as the automatic application

of the *lex loci delicti* rule, have the appeal of convenience and certainty, it has been recognized that such rules do not always achieve a sound and just result. See *Pfau v. Trent Aluminum Co., supra*, 55 *N.J.* at 515, 526.

Accordingly, we conclude that the proper approach in resolving conflict-of-law issues in liability insurance contract controversies is that which may be synthesized from this post-*Buzzone* evolution of the law in both the contract field as well as in the somewhat related tort field, particularly in the area of automobile accident litigation. This calls for recognition of the rule that the law of the place of the contract ordinarily governs the choice of law because this rule will generally comport with the reasonable expectations of the parties concerning the principal situs of the insured risk during the term of the policy and will furnish needed certainty and consistency in the selection of the applicable law. See *Buzzone v. Hartford Accident & Indemnity Co., supra*, 23 *N.J.* at 458, *Mayer v. Roche*, 77 *N.J.L.* 681, 683 (E. & A. 1909); A. Ehrenzweig, *A Treatise on the Conflict of Laws* § 174 at 460–461 (1962); R. Leflar, *American Conflicts of Law* § 86 at 173 (3 ed. 1977); *Restatement, supra*, § 193. At the same time, this choice-of-law rule should not be given controlling or dispositive effect. It should not be applied without a full comparison of the significant relationship of each state with the parties and the transaction. That assessment should encompass an evaluation of important state contacts as well as a consideration of the state policies affected by, and governmental interest in, the outcome of the controversy.

■ While this approach is necessarily broad and flexible, we find it to be appropriate in this case. It best serves and accommodates the diverse, important considerations which must be duly weighed in settling conflicts of law in litigation such as this. We thus hold that, in an action involving the interpretation of an automobile liability insurance contract, the law of the place of the contract will govern the determination of the rights and liabilities of the parties under the insurance policy. This rule is to be applied unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield.

## III

Applying this approach to the present controversy, we commence with a recognition that provisionally the law of the State of Alabama where the insurance contract was originally obtained should govern the determination of the rights and liabilities of the parties under that contract. As we have noted, that rule presumptively comports with the reasonable expectations of the contracting parties as to the primary location of the insurance risk and satisfies the needs for certainty, predictability, and uniformity. The selection of Alabama law should therefore be dispositive unless an evaluation of significant state relationships, an evaluation which includes state policies and governmental interests, would require a different result. After such an evaluation, we conclude that there are no sufficiently cogent countervailing considerations which dictate that Alabama insurance law not be followed to settle the claims in this litigation.

We turn first to an assessment of the contacts which are important in defining the relationship of each state to the subject matter of this controversy. As noted, Hays was single and a domiciliary of Alabama. When he purchased the car, he was still a high school student and had not yet joined the armed forces. The vehicle was purchased and registered in Alabama and had remained so registered. Hays had obtained the insurance policy in Alabama from a local insurance agent known to Hays and his family and who was probably familiar with their Alabama roots. The policy was issued by an insurance company authorized to do business in the State of Alabama and which undoubtedly conducted its business in conformity with Alabama insurance law. Hays' mother had "signed" the policy presumably at the request of the insurance company and in conformity with either Alabama insurance laws and regulations or customs and practices. The premium rates were in all likelihood predicated upon Alabama's statistical experience. When the accident occurred, Hays had been in New Jersey for only four or four and one-half months; his automobile had been in this State for only several weeks. At the time of the accident, Hays' presence in New Jersey was temporary and he had planned to return to

Alabama. In fact, he ultimately did so return. With respect to the accident victims, the record does not indicate the nature and extent of their contacts with New Jersey.

Thus, aside from the facts that the accident occurred in New Jersey, that Hays at the time was temporarily in New Jersey, and that his vehicle had been in this State for a relatively short period of time, no other material facts emerge which disclose a significant relationship of New Jersey to the parties or the underlying insurance transaction. Consequently, our evaluation of the important state contacts in this case demonstrates that the State of Alabama had at the time of the accident the most significant relationship to the parties and the transaction which is the subject matter of the litigation.

In addition to these significant contacts with Alabama, relevant state policy and state governmental interests are other important considerations to be weighed in determining the appropriate choice of law. *Restatement, supra,* § 6(b), (c), and (e). Hence, an examination of the respective states' concerns relative to liability insurance coverage applicable to a person driving an insured vehicle with the permission of the owner-insured is appropriate.

There are many expressions of state public policy. *Vasquez v. Glassboro Service Ass'n, Inc.,* 83 *N.J.* 86, 98 (1980). We look first to legislation as a source of the state's interest in this matter. This Court in *Buzzone* observed that if New Jersey chose through legislation to apply its standards as to scope of coverage for insurance policies to out-of-state insurance companies which insure out-of-state motorists, New Jersey courts would follow that directive even when the law of other jurisdictions dictated a contrary result. See 23 *N.J.* at 457. The Court, however, found at that time no such preemptive legislative expression. *Ibid.*

It would appear in this case that both states, New Jersey and Alabama, recognize that automobile liability insurance must cover not only a named insured but also any other person operating the owned vehicle with the permission or consent of

the insured. New Jersey's Automobile Reparation Reform Act, *N.J.S.A.* 39:6A–1 *et seq.*, specifically requires that every automobile insurance policy must provide liability insurance for persons "while using such automobile *with the permission of the named insured . . . .*" *N.J.S.A.* 39:6A–4 (emphasis added). The Motor Vehicle Financial Responsibility Law similarly provides that "[a] motor vehicle liability policy furnished as proof of financial responsibility as provided herein shall . . . insure the insured named therein and any other person using or responsible for the use of any motor vehicle *with the express or implied consent of the insured . . . .*" *N.J.S.A.* 39:6–46 (emphasis added).

Juxtaposed against these New Jersey statutory requirements, the Alabama statute appears to be virtually identical. Alabama also mandates liability coverage to persons driving a vehicle with the express or implied permission of the named insured. *Ala.Code* § 32–7–22. Moreover, the Alabama insurance policy issued in this case contained the following language:

> Insured—the unqualified word "insured" includes . . . any other person while using the owned motor vehicle, provided the operation and use of such vehicle are with the permission of the named insured or such spouse and are within the scope of such permission . . . . .

Referring to the underlying insurance legislation and insurance contracts that conform to such legislation, we can conclude that the public policy of both states with respect to liability insurance coverage of persons operating a vehicle with the consent or permission of the insured is generally consonant.

Decisional law interpreting legislation constitutes another reflection of state policy. *Vasquez v. Glassboro Service Ass'n, Inc., supra,* 83 *N.J.* at 98, *Allen v. Commercial Casualty Ins. Co.,* 131 *N.J.L.* 475, 478 (E. & A.1944). Both courts below considered the decisional law of Alabama and determined that, under Alabama law, there would be no coverage in the circumstances presented by the record in this case. 169 *N.J.Super.,* at 138. It is not clear whether or not there would be coverage in

this case under New Jersey case law.[1] We need not, however, decide the question of coverage under New Jersey law and we express no opinion with respect to the Appellate Division's ruling on this point. 169 *N.J.Super.* at 138–139.

█ Even though Alabama decisional law is considerably more restrictive and narrow than is New Jersey law with regard to the extent of insurance coverage, compare *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Robinson*, 269 *Ala.* 346, 352, 113 *So.* 2d 140, 145 (Sup.Ct.1959) (insured's classmate-passenger who drives off with car does not have implied permission of insured to use vehicle) with *Motor Club Fire & Cas. Co. v. New Jersey Mfrs. Ins. Co.*, 73 *N.J.* 425, 439 (1977), *cert.* den. 434 *U.S.* 923, 98 *S.Ct.* 402, 54 *L.Ed.*2d 281 (1977) (disturbed passenger, who has grabbed a steering wheel from insured but did not intend to deprive the insured permanently of the vehicle, was driving with implied permission of insured and was covered under insurance policy), it has been recognized that not all differences in the laws of two states demonstrate inconsistent public policies or interests. *Wilson v. Faull*, 27 *N.J.* 105, 123 (1958). Unless such differences are fundamental, foreign law need not be considered offensive or repugnant to local public policy. *Caribe Hilton*

---

[1]While it appears that Simmons used Hays' car well beyond the scope of the original permission, this factor may not be determinative under the New Jersey "initial permission" doctrine. *Matits v. Nationwide Mutual Ins. Co.*, 33 *N.J.* 488, 496–497 (1960). Hays, however, had heatedly and repeatedly demanded the return of his car; Simmons, nevertheless, persisted in keeping the vehicle against Hays' will. *Ante* at 31–32. *Cf. Motor Club Fire & Cas. Co. v. New Jersey Mfrs. Ins. Co.*, 73 *N.J.* 425, 438 (1977), *cert.* den. 434 *U.S.* 923, 98 *S.Ct.* 402, 54 *L.Ed.*2d 281 (1977) (emotionally-disturbed passenger who displaced owner-driver and drove car did not intend to deprive her permanently of the vehicle). If in fact the same result with respect to coverage would be obtained in this case by application of either New Jersey law or Alabama law, there would be no actual conflict of law between the two states, obviating the necessity to choose between them. See *Kievit v. Loyal Protective Life Ins. Co.*, 34 *N.J.* 475, 493 (1961). The case in that posture, at least where state policies are not truly inconsistent or mutually repugnant, would present at most a "false conflict" issue. *Pfau v. Trent Aluminum Co.*, 55 *N.J.* 511, 527 (1970). See also Note, "False Conflicts," 55 *Cal.L.Rev.* 28 (1967).

*Hotel v. Toland*, 63 *N.J.* 301, 308 (1973); *Keystone Ins. Co. v. Bowman*, 138 *N.J.Super.* 544, 549 (App.Div.1976); *Breslin v. Liberty Mutual Ins. Co.*, 134 *N.J.Super.* 357, 365 (App.Div.1975), aff'd 69 *N.J.* 435 (1976); *Zotta v. Otis Elevator Co.*, 64 *N.J.Super.* 344, 349 (App.Div.1960).

Here the difference in the insurance laws of each state as to the extent of coverage accorded to an insured's permittee does not implicate the fundamental public policy of these states. Both states recognize that persons are entitled to the benefits of liability insurance when injured in accidents in which the vehicle was being driven by one who had obtained the use of the vehicle with the consent or permission of the insured. While each state differs as to the duration and character of that permission or consent, the public policy of each state nevertheless seeks to achieve the same fundamental goals and objectives.

■ The distinctions between these states as to the extent of coverage do not in the context of this case demand the full and literal application of the insurance laws of New Jersey to determine the obligations of the parties in order to vindicate the public policy of this State. Our current insurance laws, particularly the Compulsory Motor Vehicle Insurance Law, *N.J.S.A.* 39:6B–1 and *N.J.S.A.* 39:6B–2, and the no-fault provisions of the Automobile Reparation Reform Act, *N.J.S.A.* 39:6A–3, 39:6A–4, and 39:6A–14, forcefully indicate a vigorous public policy in this State to assure insurance protection for automobile accident victims against financially-irresponsible motorists. See, *e. g., Fernandez v. Selected Risks Ins. Co.*, 82 *N.J.* 236, 240 (1980). Financial responsibility, however, is not to be equated with or satisfied by only an insurance policy which conforms meticulously with each and every requirement of New Jersey's insurance laws and regulations, as well as judicial decisions interpreting those requirements. Current state statutes do not reveal a legislative scheme to protect New Jersey residents by specifically imposing upon out-of-state, insured, and financially-responsible drivers, who are not otherwise directly subject to our manda-

tory insurance laws, the same or identical level of insurance liability protection required of New Jersey motorists.[2]

We conclude therefore that in this case the basic choice-of-law standard—the law of the place of contracting—should be followed. In the circumstances presented, the ultimate objective of that standard—that it will protect the reasonable expectations of the parties as to their insured risks and will serve the needs of certainty, predictability and uniformity—is clearly buttressed by an evaluation of the significant relationships of each state with respect to the parties and the subject matter of the litigation.

## IV

■ The final question presented is whether the courts below correctly interpreted Alabama law, finding that, under such law, insurance coverage would not apply to Simmons or be available to his four passengers. The trial court made factual findings that Simmons at the time of the fatal accident was no longer driving the vehicle with the permission of Hays who had specifically countermanded the permission originally given Simmons to drive the car, that the car was being driven beyond the scope of the permission initially extended to Simmons, and that Simmons at the time of the accident had taken the automobile against Hays' will. There was ample evidential support in the record for these factual determinations and the Appellate Division

---

[2]This analysis is also pertinent to the "governmental interest" test. We earlier indicated that this test has been followed in this jurisdiction in the closely related tort field in cases involving automobile accidents. *Ante* at 36. Its application has also been long recognized in other legal settings involving multistate conflicts. R. Leflar, *American Conflicts Law* § 92 at 185 (3 ed. 1977). The governmental interest test focuses upon whether a state has a legitimate concern with the resolution of the particular controversy, placing special emphasis upon the status of the parties and their connections with the state. *Ibid.* (noting the application of this test in personal property insurance contract case). Because this test is included in the significant relationship test (*Restatement (Second) of Conflict of Laws* § 6(b), (c), and (e) (1971)) and because there is a close coincidence between the facts relevant to both tests, a further elaboration here of the applicability of governmental interests as an independent test is not required.

properly affirmed them. 169 *N.J.Super.* at 138; *Leimgruber v. Claridge Associates, Ltd.,* 73 *N.J.* 450, 455–456 (1977); *State v. Johnson,* 42 *N.J.* 146, 161–162 (1964).

The trial court concluded, upon these facts, that the applicable law of Alabama would preclude coverage under the insurance policy. The Appellate Division sustained this conclusion, referring to Alabama decisional authority, *viz.: Billups v. Alabama Farm Bureau Mut. Cas. Ins. Co.,* 352 *So.*2d 1097 (Ala.Sup.Ct.1977); *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Government Employees Ins. Co.,* 286 *Ala.* 414, 240 *So.*2d 664 (Sup.Ct.1970); *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Robinson, supra.* We perceive no error in this holding.

Accordingly, the judgment below is affirmed.

PASHMAN, J., dissenting.

The majority today leaves New Jersey accident victims unprotected by automobile insurance solely because the insurance policy was issued in another state. In reaching this result, I believe the majority has failed to protect the integrity of State policy when addressing questions of choice of law. Specifically, it has ignored legislative developments following this Court's decision in *Buzzone v. Hartford Accident & Indemnity Co.,* 23 *N.J.* 447 (1957). When the proper weight is given to our State's interests, it becomes clear that New Jersey law, which would provide coverage for plaintiffs' claims, should apply in this case. I therefore respectfully dissent.

I

As its initial error, the majority strains to preserve intact the precedential value of *Buzzone*—a decision rendered 23 years ago during a different era in the development of conflict of laws. By adhering to *Buzzone*, the majority today restricts our State's interests to the limited and conditional role public policy was permitted to play in that case. When *Buzzone* is properly reassessed in the light of subsequent refinements in the law of conflicts, the need to give greater effect to this State's policies on motor vehicle insurance becomes apparent.

## A

The particular circumstances in *Buzzone* were not found to require a departure from the place of the making rule. See 23 *N.J.* at 452. Nevertheless, the Court reviewed the respective policies of the two states whose law was at issue and concluded:

We can acknowledge, along with the dissenting judge, that there might well be a legitimate interest in protecting the welfare of New Jersey citizens under all circumstances, but the answer would seem to be that this has not been accomplished through legislation. The task is one for the lawmakers and not the courts. [23 *N.J.* at 457]

In light of the "settled" place of making approach to choice of law in contract cases, the *Buzzone* Court phrased the public policy question in the following terms:

Is [the New York rule] *so repugnant to New Jersey's attitude* toward the insurer and the injured as to disallow a defense which the defendant would have in the New York courts? [23 *N.J.* at 458 (emphasis added)]

In concluding that "the Court gave appropriate emphasis to the significant relationships of the respective states to the parties and the underlying transaction," *ante* at 35, the majority is either completely misreading *Buzzone* or is reaffirming old conflicts doctrine while describing it as a new "most significant relationship" approach. Regardless of the doctrines with which *Buzzone* is "not inconsistent," *ante* at 35, it does not sanction departure from the law of the place of making unless the public policies of the two states are truly repugnant to each other. The fact that considerations of public policy were addressed by the *Buzzone* Court in 1957 indicates a recognition that application of the law of the place of making might not always be appropriate. But the essence of that recognition should be reassessed—not mechanically reapplied in its original form. Here the majority fails.

## B

Conflicts of law has been an evolving body of legal analysis. "Indeed, more drastic changes have recently been made in the common law rules of Conflict of Laws than in most other areas of the law * * *." *Restatement (Second) of Conflicts of Laws* § 5, Comment c at 9–10 (hereafter "*Restatement 2d*"). The excessive formality of the vested rights doctrine, of which

the "place of making" rule was a part, has not prevailed in the courts and has been rejected by the Second Restatement. See *Restatement 2d*, Introductory Note to Ch. 8 at 557. Rather, courts have come to analyze choice-of-law problems in terms of the various governmental interests implicated in any given factual setting. The objective of this approach to choice of law is to "accommodate in the best way possible the policies underlying the potentially applicable local law rules of the states involved." *Restatement 2d* § 5, Comment d at 10. Unlike the majority's approach, we should seek an accommodation of governmental interests unencumbered by the arbitrary barrier of "repugnancy" raised by *Buzzone*.

As the majority is careful to note, New Jersey cases following *Buzzone* did not mechanically apply the "law of the place of making." *Ante* at 36. The Court's opinion in *Kievit v. Loyal Protective Life Ins. Co.*, 34 *N.J.* 475 (1961), highlights this fact. In addressing a question of coverage under an accidental injury insurance policy, Justice Jacobs examined the pull away from the "traditional rule":

> In recent years there has been increased awareness of the unwisdom of rigid application of the traditional conflict of laws doctrine in the field of contracts and steps have been taken towards giving greater recognition to the local law of the state with which the contract has its most significant relationship. [34 *N.J.* at 492]

The Court did not pursue further inquiry, however, since the outcome would be the same regardless of which state's law was applied. Similarly, in *Caribe Hilton Hotel v. Toland*, 63 *N.J.* 301 (1973), this Court noted the trend but again was not required to take a position. In determining that a gambling debt contracted by a New Jersey resident in Puerto Rico was enforceable in New Jersey, Justice Mountain noted:

> Puerto Rican law controls the question as to the legality of the contract. Whether we simply say that the legality of a contract is to be determined by the law of the place where the contract is made, *Staedler v. Staedler*, 6 *N.J.* 380, 389 (1951); *Colozzi v. Bevko, Inc.*, 17 *N.J.* 194, 202 (1955); *Hudson v. Hudson*, 36 *N.J.* 549, 555 (1962); *Louis Schlesinger Co. v. Kresge Foundation*, 312 *F.Supp.* 1011, 1028 (D.C.N.J.1970), or whether we adopt the more modern formulation that rights and duties of contracting parties shall be determined by the law of the jurisdiction having the most significant relationship to the parties and to the transaction, *Restatement, Conflict of Laws 2d* § 188; *Kievit v. Loyal Protective*

*Life Ins. Co.*, 34 *N.J.* 475, 492–493 (1961); *HIMC Investment Co. v. Siciliano*, 103 *N.J.Super.* 27, 34 (Law Div.1968), the result in this case will be the same. [63 *N.J.* at 303]

The trend was also recognized in the lower courts. In *Breslin v. Liberty Mutual Ins. Co.*, 134 *N.J.Super.* 357 (App.Div.1975), aff'd o.b., 69 *N.J.* 435 (1976), Judge Lynch cited *Kievit* as evidence of the "trend away from former 'mechanical' formulae in deciding choice of law questions," *id.* at 364, but concluded that New York law governed the subrogation question regardless of the choice-of-law theory adopted.

Aside from simple recognition of this trend, a telling sign that it is time for this Court to reconsider a prior position is evidenced when a lower court, faced with a factual pattern requiring a choice between settled doctrine and a new approach, makes clear its reluctance in applying an outdated but still binding rule of this Court. See *Galligan v. Westfield Centre Service, Inc.*, 166 *N.J.Super.* 392, 399 (Law Div.1979), rev'd 82 *N.J.* 188, 191 n.3 (1980). Such a sign can be found in *Lewandowski v. Nat'l Grange Mut. Ins. Co.*, 149 *N.J.Super.* 591 (Law Div.1977). There the question presented was whether an employee of a New York service station engaged to repair the New York owner's car was insured under the liability policy covering the car when driving the vehicle in New Jersey against the owner's instructions. While in New Jersey, the employee was involved in an accident with a New Jersey motorist. The court's observations are particularly enlightening here:

In the present case this court must adjudicate the rights of a corporation, whose home office is in New Hampshire, and a New Jersey motorist. While New York has no particular interest in the application of its law, our Supreme Court has repeatedly enunciated the policy reasons for adopting the "initial permission" rule. The rejected permission rules render coverage uncertain, foster litigation and frustrate the legislative goal of ensuring compensation for wrongfully injured New Jersey motorists. *Matits v. Nationwide Mut. Ins. Co., supra*, 33 *N.J.* at 495, 496; *Small v. Schuncke*, 42 *N.J.* 407, 412; *Odolecki v. Hartford Acc. & Indem. Co., supra*, [55 *N.J.* 542] at 546.

Given these important New Jersey concerns and no corresponding pressing interest of New York, it would make sense to apply New Jersey law—that is, to construe the contract in accordance with the "initial permission" rule. While parties to a contract are entitled to protection of their justified expectations, this should be no barrier here. The insurer of a moving vehicle is on notice that the insured may venture into neighboring states and can take this into account when

setting rates. Yet the mandate of *Buzzone v. Hartford Acc. & Indem. Co., supra,* is clear. *Keystone Ins. Co. v. Bowman,* 138 *N.J.Super.* 544, 549 (App.Div. 1976); *Cirelli v. Ohio Cas. Ins. Co.,* 133 *N.J.Super.* 492, 497 (Law Div.1975). While a trial court need not necessarily agree with our appellate tribunals, it may not disregard them. This court will, therefore, apply the law of the place of the contract in determining the statutory impact upon the omnibus clause. It is hoped, however, that the appellate courts will take this opportunity to reexamine the *Buzzone* application of the 1934 *Restatement* as it relates to the facts of the present case. [149 *N.J.Super.* at 600–601 (footnote omitted)]

This Court has embraced the governmental interest approach in tort cases, thereby discarding the mechanical *lex loci delicti* rule. See, *e.g., Rose v. Port of New York Auth.,* 61 *N.J.* 129 (1972); *Pfau v. Trent Aluminum Co.,* 55 *N.J.* 511 (1970); *Mellk v. Sarahson,* 49 *N.J.* 226 (1967). The same approach should be adopted here in substance—not simply in name.

I recognize that a distinction exists between tort and contract settings concerning the parties' expectations as to the applicable law.

[T]he protection of the justified expectations of the parties is of considerable importance in contracts whereas it is of relatively little importance in torts * *. In the torts area, it is the rare case where the parties give advance thought to the law that may be applied to determine the legal consequences of their actions. On the other hand, parties enter into contracts with forethought and are likely to consult a lawyer before doing so. [*Restatement 2d,* § 188, Comment on Subsection (1): (b), at 576]

However, the answer to this observation is not to continue to follow mechanistic rules but to consider justified expectations in the light of other relevant factors. See *Restatement 2d* § 6(2)(d) at 10. The place of making rule possesses a false economy, for its continued application exacts too great a cost by subordinating important substantive interests to an unrealistic notion of "justified expectations." Nowhere is this cost more evident than in cases involving policies for automobile insurance.

The operation of a motor vehicle, and hence the protections granted by an insurance policy, will often implicate the interests of states other than the place of contracting. Interstate travel by automobile is too common a phenomenon to be ignored. More particularly, when coverage is the issue, the interests of the states where coverage is sought plays a more significant role than the parties' presumed expectations. This is so because of the public importance of automobile insurance. Such contracts

are not merely for the mutual benefit of insured and insurer. "[A] liability insurance contract is for the benefit of the public as well as for the benefit of the named or additional insured." *Odolecki v. Hartford Acc. & Indem. Co.*, 55 *N.J.* 542, 549 (1970). For this reason coverage is often mandated by statute, and contractual provisions to the contrary are found void—regardless of the parties' expectations. See *Fernandez v. Selected Risks*, 82 *N.J.* 236 (1980); *Selected Risks Ins. Co. v. Zullo*, 48 *N.J.* 362 (1966); see also *Billups v. Alabama Farm Bur. Mut. Cas. Ins. Co.*, 352 *So.*2d 1097 (Ala.1977).

The peculiar feature of automobile insurance contracts—of which the majority shows no awareness—is that almost invariably, questions regarding their interpretation arise as part of a tort claim. In every case determining insurance coverage, the same governmental interests implicated in any tort action are present. The importance of insurance coverage to recovery in an action for the negligent operation of a motor vehicle cannot be overstated. Insurance policies often provide the only source for compensating innocent victims. The *Buzzone* Court's observation that "[the] non-resident driver is as fully answerable for injuries which he causes upon our highways as any other," 23 *N.J.* at 457, is in present-day circumstances an indulgent fiction. Yet, despite the majority's purported "synthesis" of conflicts principles in the contract and tort fields, *ante* at 37, it enshrines this fiction as the fundamental premise of choice-of-law doctrine in automobile insurance cases.

The majority's holding that the law of the place of the making will govern "unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield," *ante* at 37, is but a thinly-veiled restatement of *Buzzone*'s rule of repugnancy. As the majority notes, "[u]nless such differences are fundamental, foreign law need not be considered *offensive or repugnant* to local public policy," *ante* at 41 (emphasis supplied). Thus, although the Court takes pains to reprint the relevant considerations offered in the *Restatement 2d*, it gives only lip service to their application. The best example of this is the

majority's express refusal to explore public policy considerations inherent in this State's decisional law. *Ante* at 40. It is thus impossible for the majority to determine the extent and nature of any conflict. Instead, it merely directs attention to the need for certainty and what amounts to a parochial view of the reasonable expectations of parties to an automobile insurance contract. See *ante* at 37–39. Ultimately, the majority continues to cling to a rule in which this State's interests can play but a limited role. To say that this Court has adopted the substance of the Second Restatement would be incorrect. Neither *Buzzone* nor the majority's approach gives fair consideration to the governmental interests of New Jersey.

Only if *Buzzone*—in its original and present form—is relegated to the era in which it arose can the governmental interest approach be properly applied. Under this approach, indicators of our State's strong public policy regarding automobile insurance require the application of New Jersey law to the present case.

## II

Application of the governmental interest approach first requires a determination that an actual conflict exists. See *Pfau v. Trent Aluminum Co., supra.* The respective outcomes under Alabama and New Jersey law must therefore be compared before considering the relevant choice-of-law factors.

## A

It is readily apparent that the two states have taken different approaches to the question whether an individual is operating a vehicle with the owner's permission. Alabama has adopted the "minor deviation" rule, under which the facts and circumstances of each case must be examined to determine whether the particular use was authorized. See *Harrison v. Densmore,* 279 *Ala.* 190, 183 *So.*2d 787 (1966); *State Farm Mut. Auto. Ins. Co. v. Birmingham Elec. Co.,* 254 *Ala.* 256, 48 *So.*2d 41 (1950).

New Jersey has rejected the "minor deviation" rule in favor of the "initial permission" rule, under which coverage is afford-

ed those receiving permission to use the vehicle in the first instance, regardless of changes in the character or scope of such use. See *Motor Club Fire & Cas. Co. v. N. J. Manufacturers Ins. Co.*, 73 *N.J.* 425 (1977), *cert. den.*, 434 *U.S.* 923, 98 *S.Ct.* 402, 54 *L.Ed.*2d 281 (1977); *Odolecki v. Hartford Acc. & Indem. Co.*, *supra*; *Small v. Schuncke*, 42 *N.J.* 407 (1964); *Matits v. Nationwide Mut. Ins. Co.*, 33 *N.J.* 488 (1960).

Despite the difference in the rules chosen by the two states, a true conflict would not exist unless their application to the facts of this case would result in coverage under one approach and non-coverage under the other.[1] Examination of Alabama law leads to the conclusion that Simmons was not using the vehicle with Hays' permission. Proper application of New Jersey's initial permission rule reveals that he was.

There is no question that Hays gave express permission to use his car to Simmons. The dispute centers around whether that permission continued so as to cover Simmons' use of the vehicle at the time of the accident. Hays testified that at 11 a.m. on the day of the accident Simmons asked him if he could borrow his car to go cash his paycheck at the local bank. Hays had never lent his car to Simmons or anyone else before. According to Hays, Simmons told him that he'd be gone "fifteen, thirty minutes," that "he was just going straight down to cash the check and he'd be right back." Hays further explained:

> I told him that I was planning on going somewhere after I got off duty that afternoon. I was getting off at four o'clock and I was wanting to go somewhere; in fact, go see a girlfriend, and he said he'd be gone just a few minutes, you know, fifteen, thirty minutes.

The arrangement was that Simmons was "coming straight back and * * * going to give [Hays] the keys back." The record reveals that Simmons did not bring the car back in 15 or 30 minutes (nor did he contact Hays). Hays testified that he

---

[1] The majority recognizes that "Alabama decisional law is considerably more restrictive and narrow than is New Jersey law with regard to the extent of insurance coverage * * *." *Ante* at 41. The majority finds it unnecessary, however, to resolve the question of coverage under New Jersey law by its application of the *Buzzone* rule of repugnancy. *Ante* at 40.

searched for his car on the base after his noon to 4 shift, but was unable to locate it. Thereafter, Hays slept until his next duty time, which was fire watch from midnight to 4 a.m. Hays testified that a "couple of hours" after he began his watch he spotted his car in front of the "Powder Keg," a nightclub on base. As he approached his car, the decedents, including Simmons, were just coming out of the nightclub. Simmons and the others reached the car before Hays got to it and began getting into the vehicle. Hays testified that he asked Simmons for the keys back "about three different times," but that Simmons just said "no."

While they were at the car, Robinson asked Hays if he would take him to see his wife the next morning. Hays testified that he told Simmons this; Simmons' reply was to tell Robinson to go ahead and get in the car, that he (Simmons) would take him there. Hays went around to the passenger side, where "some other guy" whom Hays did not know was leaning against the side of the car, getting ready to get in. Apparently Hays was still asking for his keys back. This person told Hays "that I was lucky I wasn't over there behind the trucks, that if I was he'd whip my ass." After this last person got in the car someone told Hays that they were going over to Red Bank to the house of some four or five girls who were standing in the Powder Keg parking lot and getting into their own car. At that point Simmons and the others left, following the girls. Hays went back on duty until four o'clock and then went to his room to sleep. About an hour later he was awakened and informed of the accident.

The Alabama insurance policy issued in this case contained the following language:

> Insured—the unqualified word "insured" includes:
>
> *      *      *      *      *      *      *      *
>
> (4) any other *person* while using the *owned motor vehicle*, PROVIDED THE OPERATION AND ACTUAL USE OF SUCH VEHICLE ARE WITH THE PERMISSION OF THE NAMED INSURED OR SUCH SPOUSE AND ARE WITH THE SCOPE OF SUCH PERMISSION . . . [emphasis in original]

Under Alabama law, the omnibus clause in State Farm's insurance policy would be interpreted to provide coverage for

any individual using the Hays vehicle with either express or implied permission. See *Crawley v. Alabama Farm Bur. Mut. Cas. Ins. Co.*, 295 *Ala.* 226, 326 *So.2d* 718 (1976); *Royal Indem. Co. v. Pearson*, 287 *Ala.* 1, 246 *So.2d* 652 (1971). As noted above, *supra* at 50, under Alabama's "minor deviation" rule, the facts and circumstances must support a reasonable inference of permissive use. *Harrison v. Densmore*, 183 *So.2d* at 790. Although Hays' express permission did not extend beyond Simmons' use of the car to go to the bank, other facts and circumstances might exist which would support his later use of the car on the trip to Red Bank.

We have held that in order to support an inference that one had implied permission to use the automobile of another for his own pleasure and purposes, there must be a *course of conduct* engaged in by the parties over a period of time prior to the use in question, *or, if in the first instance, there must be particular circumstances* to justify an inference of implied permission. [*Pettis v. State Farm Mut. Auto. Ins. Co.*, 286 *Ala.* 344, 239 *So.2d* 772, 775 (1970) (emphasis added)]

Hays' testimony that he considered Simmons "an okay guy" and his "friend," and that they had socialized together at the base is a factor to be considered in this regard. However, their social relationship is not a sufficient basis for implying permission. There must be a course of conduct in the *use* of the car by the permittee. *Alabama Farm Bur. Mut. Cas. Ins. Co. v. Robinson*, 269 *Ala.* 346, 113 *So.2d* 140, 146 (1959). Hays' testimony that he had never lent his car to Simmons or anyone else before effectively negatives the existence of a course of conduct "such as to signify, and be compatible only with, an understanding consent amounting to permission to use the automobile for [Simmons'] personal purpose on the occasion in question." *Pettis, supra*, 239 *So.2d* at 775.

Review of Alabama decisions on the existence of implied consent in the first instance also leads to the conclusion that Simmons would be considered to have been using Hays' car without permission at the time of the accident. For implied permission to exist, there must be knowledge of the use of the automobile without objection or reprimand, see *Alabama Farm Bur. Mut. Cas. Ins. Co. v. Robinson, supra*, or a background of business practice that would support an inference of permissive

use, see *Royal Indem. Co. v. Pearson, supra; Harrison v. Densmore, supra.* In no event does permission exist when the use of an automobile is contrary to express instructions which do not convey a permissive attitude. *Pettis,* 239 *So.*2d at 775. It would thus appear that the facts and circumstances would not support a reasonable inference that Simmons had Hays' permission to use the car on the night in question, and that therefore coverage would be denied under Alabama law.

Under New Jersey law, "if a person is given permission to use a motor vehicle in the first instance, any subsequent use short of theft or the like while it remains in his possession, though not within the contemplation of the parties, is a permissive use within the terms of a standard omnibus clause in an automobile liability insurance policy." *Matits v. Nationwide Mut. Ins. Co., supra,* 33 *N.J.* at 496–497. Simmons' use of the Hays vehicle at the time of the accident must therefore be evaluated to determine whether it constituted "theft or the like."

The leading case in this area is *Motor Club Fire & Cas. Co. v. N. J. Manufacturers Ins. Co., supra.* In that case an emotionally disturbed passenger was riding in an automobile with his mother and the insured owner, who was driving. While the car was stopped at an intersection, the young man, who had been seated in the front seat next to the door, began climbing over his mother, who was seated between him and the driver, and grabbed the steering wheel. After he told the owner to get out of the car, she pressed the emergency brake and got out onto a traffic island. Despite his mother's pleading, the young man took the wheel and began to drive. The automobile almost immediately struck another car, went out of control, and hit a building. His mother was severely injured.

After determining that the change in use from passenger to driver did not terminate the owner's consent to use her car, the Court turned to the "theft or the like" formula. It reasoned that in light of the strong legislative policy to protect innocent accident victims, the exception must be construed narrowly. 73 *N.J.* at 438. The Court defined theft as "nothing less than the willful taking of another's car with the intent permanently to deprive the owner of its possession and use." *Id.* As for the "or

the like" component, the Court noted that it "contemplated conduct much more like traditional theft" than the conduct involved in that case. *Id.* The Court found nothing in the record which suggested that the young man intended to steal the car: the owner did not consider his acts a "theft" and although she was frightened, he did not touch or threaten her. *Id.* at 438–439.

It is apparent, then, that in applying the "theft or the like" standard, the focus is on the conduct of the permissive user, not the desires of the owner. See also *Odolecki, supra.* The social relationship between Hays and Simmons is another significant factor. *Cf. State Farm Mut. Auto. Ins. Co. v. Zurich Am. Ins. Co.*, 118 *N.J.Super.* 84, 92 (App.Div.1972), aff'd in part and rev'd in part on other grounds, 62 *N.J.* 155 (1973) (noting that permission will more readily be implied where the owner and operator are relatives or close friends). If a complete stranger had departed in Hays' car, the conduct would more reasonably support an inference that the person intended to permanently deprive Hays of his car. When a friend overstays his welcome, that inference is not so easily drawn. Hays himself testified that he did not consider the car to have been stolen. Rather, he explained that he fully expected to get the car and keys back the following morning. This is not a case of "theft or the like."

Focusing on Simmons' conduct and construing "theft or the like" as did the Court in *Motor Club*, the conclusion is inescapable that Simmons' use of the car at the time of the accident was permissive. Since under Alabama law Simmons was operating the car without Hays' permission, a true conflict exists with regard to the coverage question presented.

### B

The governmental interest approach next requires assessment of the relevant governmental policies evidenced by the laws of each state. An examination of these policies will determine which state has the "most significant relationship to the transaction and the parties * * *." *Restatement 2d*, § 188 at 575.

Two basic governmental interests underlie New Jersey's initial permission rule: to assure that all persons wrongfully

injured have financially responsible persons from which to seek damages, and to minimize litigation of omnibus coverage. *Odolecki*, 55 *N.J.* at 548–549; *Matits*, 33 *N.J.* at 496; see *Motor Club*, 73 *N.J.* at 433. The Legislature has emphasized the strength of the former interest. See, *e. g.*, *N.J.S.A.* 39:6–23 *et seq.* (Motor Vehicle Security-Responsibility Law). New Jersey's interest in affording coverage to accident victims is demonstrably stronger today than it was when *Buzzone* was decided. In 1972 the Legislature enacted the Compulsory Motor Vehicle Insurance Law, *N.J.S.A.* 39:6B–1 and 2, which requires every owner of a motor vehicle "registered or principally garaged in this State" to maintain motor vehicle liability insurance coverage in specified amounts. At the same time the Automobile Reparation Reform Act, *N.J.S.A.* 39:6A–1 *et seq.*, became law. The No Fault provisions of the latter act require coverage regardless of fault in some cases. Another provision made uninsured motorist protection compulsory rather than elective. *N.J.S.A.* 39:6A–14, repealing *N.J.S.A.* 17:28–1.2.

To a certain extent, Alabama shares New Jersey's interest in providing coverage for accident victims. See *Ala.Code* § 32–7 *et seq.* (Motor Vehicle Safety-Responsibility Act). Alabama's minor deviation rule, however, rejects maximum coverage in favor of giving greater effect to the contract language employed by the parties. It thus implicates notions of "freedom of contract" —notions which the courts of this State have repeatedly rejected as illusory, see, *e. g.*, *Cooper v. Government Employees Ins. Co.*, 51 *N.J.* 86, 93 (1968); *Allen v. Metropolitan Life Ins. Co.*, 44 *N.J.* 294, 305 (1965)—as well as compensation for innocent victims.

It therefore appears that both states have an interest in this suit—their respective policies would be furthered by the application of their law to the facts. See *Pfau*, 55 *N.J.* at 521–522. It is clear, however, that on the facts of this case New Jersey is the state of "most significant relationship." The fact that the matter is being litigated in this State triggers New Jersey's interest in reducing omnibus coverage litigation. The accident occurred in New Jersey, and the owner and victims were residing in this State at the time. The fact that Hays intended to

return to Alabama after his tour of duty does not dilute New Jersey's interest based on his presence within this State.[2] Hays had resided in New Jersey for more than four months at the time of the accident. While the record does not disclose the domiciles of the victims,[3] it appears that they, too, had been residing on the base for some time. The insured vehicle was not just "passing through" the State—it had been garaged here for eight or nine weeks and had traveled approximately 500 miles in this State at the time of the accident. The location of the risk for the insured vehicle—a significant factor in choice-of-law questions involving insurance contracts, see *Restatement 2d*, § 193, Comment b at 611–612—is, again, in New Jersey. These factors directly implicate New Jersey's coverage policy.

By contrast, Alabama's interest in compensating accident victims is only involved in the most general sense, if at all. While Alabama has expressed an interest in permitting an insurer to restrict coverage by contract, that interest carries little weight in the present case. The policy covering the Hays car was renewed when Hays was stationed in New Jersey and his car was garaged at the base. Since the principal location of the risk was no longer in Alabama, that state's interest in permitting insurers to tailor the risks they will accept ought not to dominate this Court's decision.

Finally, the justified expectations of the parties must be considered. Protection of such expectations is a basic policy underlying the field of contracts. See *Restatement 2d* at § 188, Comment on Subsection (1): (b) at 577. On the facts before us, it cannot be said that justified expectations would be frustrated by the application of New Jersey law. As already discussed, see

---

[2]The majority finds where Hays came from and where he ultimately intended to return more significant than where he in fact resided during the period relevant to this case. Apparently, it believes that this State has little legitimate interest in the welfare of those who reside in the several military bases located in the State. One wonders whether students at residential colleges and universities are in a similar position under the majority's view.

[3]Robinson's request for a ride to visit his wife in Red Bank is an indication that he might have been a New Jersey domiciliary.

*supra* at 48–49, the mobile character of an insured automobile puts the parties on notice that more than one state might come to have an interest in applying its law to the question of coverage. The regulated status of the automobile insurance industry is widely known—particularly to those regulated. Plaintiff's status as a corporation licensed to do business in many states belies the notion that it relied on the applicability of Alabama law in issuing its policy to Hays. Since Hays' insurance policy was renewed while his automobile was operated and garaged in New Jersey, whatever reliance the insurer could have placed on the protection of Alabama law was completely unjustified. The majority's assertion that application of Alabama law "will protect the reasonable expectations of the parties as to their insured risks * * *," *ante* at 43, lacks the support of close factual scrutiny that contemporary conflicts doctrine requires.

### Conclusion

For the foregoing reasons, I would apply New Jersey's initial permission rule and hold that Simmons was operating the Hays vehicle with permission on the night in question. I would therefore reverse the judgment of the Appellate Division.

*For affirmance*—Justices SULLIVAN, CLIFFORD, HANDLER and POLLOCK—4.

*For reversal*—Justice PASHMAN—1.