ALLSTATE INSURANCE COMPANY, PLAINTIFF–APPELLANT, v. WILLIAM SHANNON BRACKIN, A MINOR BY HIS NATURAL PARENTS OR G/A/L; MICHAEL SCAFFIDI, AN INFANT BY HIS G/A/L, ROBERT SCAFFIDI; STEVEN JAMES NUNE-VILLE, AN INFANT BY HIS G/A/L, BARBARA G. NUNE-VILLE; BENITA ALEXIOU, ADMINISTRATIX OF THE ES-TATE OF PHILLIP ALEXIOU; ARMANDO E. FRAIRE, SR.; ARMANDO E. FRAIRE, JR., AND FIREMAN'S FUND INSUR-ANCE COMPANY, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 13, 1988—Decided June 28, 1989.

Before Judges MICHELS, LONG and MUIR, Jr.

*Robert F. Novins* argued the cause for appellant Allstate Insurance Company (*Novins, York, DeVincens & Pentony,* attorneys; *Robert F. Novins,* of counsel and on the brief).

*Timothy D. Scaffidi* argued the cause for respondent Michael Scaffidi, an infant by his guardian ad litem, Robert Scaffidi (*Ragonese & Scaffidi,* attorneys; *Timothy D. Scaffidi,* of counsel and on the letter brief).

*Rocco T. Santora* argued the cause for respondent Steven James Nuneville, an infant by his guardian ad litem, Barbara G. Nuneville.

*John Aleli* argued the cause for respondent Fireman's Fund Insurance Company (*Megargee, Youngblood, Franklin & Corcoran,* attorneys; *John Aleli,* of counsel and on the brief).

Respondents William Shannon Brackin, a minor by his natural parents or guardian ad litem; Benita Alexiou, Administratrix of the Estate of Phillip Alexiou; Armando E. Fraire, Sr., and Armando E. Fraire, Jr., did not file briefs on this appeal.

The opinion of the court was delivered by

**MICHELS, P.J.A.D.**

Plaintiff Allstate Insurance Company (Allstate) appeals from a judgment of the Law Division that declared that Allstate's Automobile Liability Insurance Policy provided coverage to defendant William Shannon Brackin (Brackin) in connection with all claims arising out of an automobile accident that occurred on January 21, 1986, in Winslow Township, New Jersey.

Allstate instituted this declaratory judgment action to determine the extent of coverage afforded to defendant Armando E. Fraire, Sr. (Dr. Fraire), the person named as the insured under the policy. The Allstate policy was issued to Dr. Fraire in Pennsylvania in 1981 and provided coverage for, among other cars, Dr. Fraire's 1981 BMW. Dr. Fraire subsequently gave the car to his son, defendant Armando Fraire, Jr. (Armando), cautioning him never to lend the car to anyone. Armando had free use of the car, but title to the car remained in his father's name. Moreover, Armando had no authority to sell the car. Dr. Fraire testified that, "I would say that it [the BMW] was for his [Armando's] personal use, but it was my car, technically it was my car, not his car." In late 1983, the Fraires moved from Pennsylvania to The Woodlands, Texas. They registered the car in Texas and obtained Texas license plates. Allstate, however, continued to treat the policy as a Pennsylvania policy.

The extent of coverage afforded under the Allstate policy is at issue because of a series of events that began in January 1986 with Armando taking a trip to Mexico in the BMW with three people he had recently met, including Brackin. Armando had not informed his parents of his plans to take such a trip and left unannounced with the three passengers. The Mexican border is approximately eight hours from the Fraires' home in The Woodlands. Armando testified that he intended to drive to Mexico, but that Brackin would drive if he became tired. In Mexico, while Brackin was driving, the car was stopped by the police and all occupants of the car were taken to a police station

for interrogation. Armando became unruly and was detained by the police, who released Armando's three companions. The three took the BMW, apparently on the strength of Armando's statement previous to the stop by police that if he were detained in Mexico they should take the car and he would "catch-up" with them later, without being specific as to where or when they would meet.

Defendant Barbara Nuneville, the mother of defendant Steven Nuneville (Nuneville), one of the injured parties, testified that both Brackin and Phillip Alexiou (Alexiou), the boy who died in the accident, told her when they arrived in New Jersey that Armando had told his companions that they could take the car to New Jersey, as long as they returned the car by the end of January. Armando, however, testified that the car was taken when he stopped to use the bathroom at a gas station in Mexico, leaving the keys in the car. When Armando exited the bathroom, the car and his three companions were gone.

Armando, finding himself alone in Mexico without a car, hitchhiked a ride to the border of Brownsville, Texas, and walked through customs. He then walked to his uncle's home in Brownsville and, shortly after midnight on Saturday, January 18, telephoned his parents. Sometime in the early hours of the morning, Dr. Fraire, his wife and her brother left The Woodlands to travel to Brownsville to retrieve Armando. While driving to Brownsville, the Fraires passed a BMW headed in the opposite direction that Dr. Fraire immediately recognized as his BMW. He turned his car around and pursued the BMW back toward The Woodlands.

Dr. Fraire eventually caught the BMW, recognized the license plate and pulled alongside it. Dr. Fraire ordered the occupants of the BMW to stop, but they refused to do so and told the doctor that they had purchased the car from Armando. Later, at a traffic light, the occupants of the BMW told the Fraires that the BMW would be returned to them at The Woodlands. At this point, Dr. Fraire gave up the chase.

The Fraires reported the BMW as stolen at the police station in Refugio, Texas, where they had abandoned their pursuit of the car. From there, they proceeded to Brownsville, where they picked up their son and again reported that the BMW was stolen. Dr. Fraire was advised by the Brownsville police to report the stolen car in his hometown, preferably that same day. Dr. Fraire and his family returned to The Woodlands, where his wife reported to the police that the BMW had been stolen. Despite the numerous contacts with various police departments in Texas, the BMW never was listed as stolen in the NCIC stolen car computer system.

In the meanwhile, Brackin, Alexiou and Norman Grays (Grays) headed north. The three companions possessed no money and, therefore, stole gas and food as they traveled. When they arrived in Indiana, Grays left the group. Brackin and Alexiou continued on to New Jersey, where Alexiou had relatives and friends. On the morning of the accident, January 21, 1986, Armando received a call from Alexiou. According to Armando and his mother, whose brother had listened to the conversation on another extension, Alexiou told Armando that the car would be returned if all charges were dropped. Armando agreed.

In the early evening of that same day, Brackin was driving the BMW in Winslow Township with Alexiou and two of Alexiou's friends from New Jersey, defendants Michael Scaffidi (Scaffidi) and Nuneville. The tires were badly worn and Brackin was speeding. (Although Brackin stated at the site of the accident that he had been driving within the speed limit, he subsequently contradicted that statement by claiming that he had not been driving at all.) The car swerved off the road, flipped several times, ejecting three of the four occupants, and came to rest on the side of the road. The police arrived and transported the injured boys to a hospital, where Alexiou died of chest injuries received when he was thrown from the car. At least two of the other occupants of the car, Brackin and Scaffidi, also were badly injured.

Scaffidi and Nuneville instituted suit against Brackin, Dr. Fraire and Armando to recover damages for the personal injuries they sustained in the accident. In addition, Alexiou's estate notified Dr. Fraire that a suit would be instituted against him seeking damages for the death of Alexiou. Allstate denied coverage to Brackin and instituted this declaratory judgment action, seeking a declaration as to the extent of the coverage afforded by its Automobile Liability Insurance Policy. The policy, in pertinent part, provides:

The coverages of this policy apply only when a specific premium is indicated for them on the declarations page. If more than one auto is insured, a coverage premium will be shown for each auto. Allstate, relying upon the declarations, subject to all terms of the policy and for payment of the premiums, makes the following agreements with you.

When And Where The Policy Applies

During the premium period, your policy applies to losses to the auto, accidents and occurrences within the United States of America, its territories or possessions or Canada, or between their ports.

\*    \*    \*    \*    \*    \*    \*    \*

Allstate will pay for all damages you are legally obligated to pay—because of bodily injury or property damage meaning:

(1) Bodily injury, sickness, disease or death to any person; and

(2) Damage to or destruction of property.

Under these coverages, your policy protects you from claims for accidents arising out of the ownership, maintenance or use, loading or unloading of the auto we insure.

We will defend you if you are sued as the result of an auto accident. This defense will be supplied even if the suit against you is groundless, false or fraudulent. We will defend you at our own expense, with counsel of our choice and, may settle any claim or suit if we feel this is appropriate.

\*    \*    \*    \*    \*    \*    \*    \*

Definitions

(1) "Allstate", "We", "Us" or "Our"—mean the Allstate Insurance Company or Allstate Indemnity Company as indicated on the declarations page of the policy.

(2) "Auto"—means a land motor vehicle designed for use principally upon public roads.

(3) "Resident" or "Reside"—mean the physical presence in your household with the intention to continue living there. Unmarried dependent children while temporarily away from home shall be considered residents, if they intend to continue to live in your household.

(4) "Utility Auto"—means an auto with a rated load capacity of 2,000 pounds or less of the pick-up body, sedan delivery or panel truck type.

The trial court, at the conclusion of the proofs, found that Armando was "the 'real' or beneficial owner of the [BMW]" and "was the principal driver and apparently had unlimited access to [the car]." The trial court determined that, under Pennsylvania law, there was a "sufficient connection" between Dr. Fraire's conduct and Brackin's operation of the BMW to find that Brackin had permission to use the car. The trial court, therefore, held that Brackin was an additional insured under the Allstate policy and entitled to coverage for the New Jersey accident. We disagree and reverse.

■ Preliminarily, we agree with the trial court that Pennsylvania law governs the rights and liabilities of the parties under the Allstate policy. Moreover, the litigants do not seriously challenge on appeal the application of Pennsylvania law to resolve the dispute before the court. Choice-of-law rules in New Jersey regarding automobile liability insurance policies are stated in *State Farm Mut. Auto. Ins. Co. v. Simmons' Estate*, 84 *N.J.* 28, 37 (1980):

> [I]n an action involving the interpretation of an automobile liability insurance contract, the law of the place of the contract will govern the determination of the rights and liabilities of the parties under the insurance policy. This rule is to be applied unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield.

*See also Muto v. Kemper Reinsurance Co.*, 189 *N.J.Super.* 417 (App.Div.1983).

Here, the Allstate policy was issued in Pennsylvania to residents of that state and provided coverage for a car registered in Pennsylvania. The place of the contract was Pennsylvania. Although the car was registered in Texas when the family moved there, the principles set forth in *Simmons' Estate* mandate that Pennsylvania law be applied in this instance. Neither Texas nor New Jersey possess interests substantial enough to override the basic standard regarding choice-of-law.

We turn, then, to the issue of the scope of the coverage afforded by the Allstate policy. The policy, in pertinent part, provides as follows:

Persons Insured

(1) While using your insured auto

(a) You,

(b) Any resident relative, and

(c) Any other person using it with your permission.

*   *   *   *   *   *   *   *

Definitions

(5) "You" or "Your"—mean the policyholder named on the declarations page and that policyholder's resident spouse.

Here, Armando was not the named insured and, therefore, the trial court's conclusion that Armando could give Brackin permission to use the car was clearly erroneous. Dr. Fraire, the policyholder named on the declarations page, was the only person who could give that permission. It is undisputed on this record that Dr. Fraire never expressly permitted Brackin to use the car.

The pivotal issue, therefore, is whether Brackin, for purposes of coverage under the omnibus clause, had implied permission to drive the car. There appears to be but a few reported decisions in Pennsylvania determining whether a person who is given a broad grant of control by the named insured over a car may use that power to permit others to drive the car, so that those subsequent permittees are covered under the omnibus clause in the named insured's policy. These reported decisions require some connection between the named insured's conduct and the operation of the car by the third person. "[T]he critical question will always be whether the named insured said or did something that warranted the belief that the ensuing use was with his consent." *Belas v. Melanovich*, 247 *Pa.Super.* 313, 324, 372 *A.2d* 478, 484 (1977). *See also Federal Kemper Ins. Co. v. Neary*, 366 *Pa.Super.* 135, 140, 530 *A.2d* 929, 931 (1987); *Ins. Co. of No. America v. State Farm Mut. Ins. Co.*, 266 *Pa.Super.* 197, 200, 403 *A.2d* 611, 612 (1979); *Crespy v. Blies-*

*mer*, 248 *Pa.Super.* 441, 443, 375 *A.2d* 179, 180–181 (1977); *Motorists Mut. Ins. Companies v. Great Lakes Laboratories, Inc.*, 687 *F.Supp.* 198, 200 (W.D.Pa.1988).

For example, in *Belas* the named insured allowed her nephew to borrow her automobile to use for various errands and to go out that night. Without the permission of the named insured, the nephew permitted a friend to drive the car, at which time an accident occurred. In reversing a jury finding that the friend was an additional insured under the omnibus clause of the named insured's automobile policy, the Pennsylvania Supreme Court emphasized that, since the named insured never expressly gave permission to the nephew's friend to drive her car or to the nephew to permit others to drive the car, the issue was whether such permission could be implied from the permission given to the nephew. The court stated:

> Whether there was such an implication is not a question the answer to which turns on considerations of social policy. It is rather an individual, factual question of what [the named insured] may reasonably be understood to have meant, when she told [her nephew] that he could use her automobile; one must look, in other words, not at social policy (should people like [the injured party] be compensated?), but at [the named insured].
>
> \*     \*     \*     \*     \*     \*     \*     \*
>
> From these decisions it will be seen that the critical question will always be whether the named insured said or did something that warranted the belief that the ensuing use was with his consent. There must be "a connection made" with the named insured's own conduct; proof of "acts, circumstances, and facts, such as the continued use of the car", will be insufficient "unless they attach themselves in some way to the acts" of the named insured.
>
> \*     \*     \*     \*     \*     \*     \*     \*
>
> There is nothing in the record that can support a finding of a connection between [the named insured] and [the nephew's friend]. [The named insured] said or did nothing to entitle [the nephew] to believe that he could loan the automobile to [his friend]. It does not appear that [the nephew] had ever before loaned the automobile—to [his friend] or anyone else. Nothing appears to suggest that [the named insured] might have suspected that on the evening in question [her nephew] would for the first time loan her automobile to someone. Nothing appears to suggest that [the named insured] had ever spoken to [the nephew's friend], or even knew him. It only appears that [the named insured] loaned her automobile to [the nephew], with instructions that since he had only a junior license he must be sure to be home with it on time.

Both on principle and under the decisions of our Supreme Court and this court, this was not enough to permit a finding of any permission by [the named insured] encompassing [the nephew's friend's] use of her automobile. [*Belas v. Melanovich, supra,* 247 *Pa.Super.* at 321, 324, 325, 372 *A.*2d at 482, 484, 485.]

In *Ins. Co. of No. America v. State Farm Mut. Ins. Co., supra,* 266 *Pa.Super.* 197, 403 *A.*2d 611, the daughter of the named insured permitted a roommate to drive the family car, whereupon the automobile was involved in an accident that injured two persons. The named insured had not expressly stated that his daughter could permit others to drive the car. In fact, the daughter needed specific permission from her parents if she wanted to use the car. In affirming a summary judgment that the daughter's friend was not an additional insured under the named insured's automobile policy, the Pennsylvania Superior Court stated:

> The basis for the lower court's ruling was that it failed to find in the depositions any connection between the named insured in State Farm's policy ... and [the driver] from which permission to use the automobile by [the driver] could be implied. This is the crucial factor in such cases. *Belas v. Melanovich,* 247 Pa.Super. 313, 372 A.2d 478 (1977).

> \*       \*       \*       \*       \*       \*       \*       \*

> Under the foregoing statement of facts, we can find no sufficient connection between the father and the permissive use of the car by [the driver] granted to her by [the daughter] to satisfy the requirements set forth in *Belas v. Melanovich* (supra). The father's knowledge that his daughter and [the driver] were roommates does not supply the necessary facts to establish that connection; nor, in our opinion, was the special permission given [the daughter] by her father to use the automobile to transport her belongings from Ocean City to her home of sufficient scope to include a right in [the daughter] to grant permission to [the driver] to use the car. [266 *Pa.Super.* at 200–01, 403 *A.*2d at 612–613.]

In *Volk v. Cacchione,* 395 *Pa.* 636, 150 *A.*2d 849 (1959), the son of the named insured permitted a friend to drive the named insured's car. The car was involved in an accident while the friend was driving, and the insurer of the named insured won a judgment n.o.v. in an action brought by the estate of the person killed in the accident. The record indicated that the son had permitted the friend to drive the insured vehicle on a number of occasions, albeit always with the son as a passenger at the time. In addition, the named insured used the car only on

weekends, his son being the principal operator of the vehicle. Nevertheless, the Pennsylvania Supreme Court affirmed the trial court's decision that the son's friend was not an additional insured under the omnibus clause of the named insured's policy:

> In order to come within the terms of the policy plaintiff would have to prove that [the son's friend] was permitted by [the named insured] to use his automobile on this particular night, or for this particular pleasure trip, or would have to prove that [the named insured] permitted [the son's friend] to use the automobile for his *unlimited* personal pleasure and with no younger member of [the named insured's] family present.
>
> We agree with the able opinion of the Court below that the evidence was insufficient to sustain plaintiff's burden of proving that [the son] was the person who was insured by defendant, or to warrant the submission to the jury of the question of implied permissive use allegedly granted by [the named insured] to [the son's friend] for his pleasure trip the night (and morning) of the accident. [395 *Pa.* at 642, 150 *A.*2d at 852 (emphasis in original).]

Equally on point is the recent federal district court decision in *Motorists Mut. Ins. Companies v. Great Lakes Laboratories, Inc., supra.* There, the automobile liability policy was issued to defendant Great Lakes Laboratories. The covered vehicles included a car purchased by the president of Great Lakes Laboratories for the use of his son while his son was at college. The son was instructed not to let anyone else drive the car and was reprimanded on the one occasion when his father discovered that he had permitted a friend to borrow the car. Nevertheless, the son often allowed others to drive the automobile, and one of those uses resulted in an accident that killed a passenger in the vehicle. It was undisputed that the driver never received explicit permission from any named insured to drive the automobile. Rather, the defendants argued that the driver received implied permission from the named insured based upon the course of conduct of the named insured. The court stated:

> In support of their claim of implied permission, the defendants rely heavily on the fact that [the son] referred to the car as being his own, and appeared to [the driver] to have unlimited use and ownership. Furthermore, they argue that [the driver] had driven the car on many occasions with [the son's] permission. We find these facts to be wholly irrelevant to the issue of implied consent. There is no evidence whatsoever that [the father] was aware of either [the son's] representations as to the ownership of the car, or that [the son] had allowed [the driver] to drive the car on previous occasions. Proof of [the son's]

acts and representations and [the driver's] previous use of the car are simply insufficient unless they attach themself in some way to the acts of [the father]. Here there has been no such connection made, and [the father] cannot be said to have thereby acquiesced in [the driver's] use of the car. [687 *F.Supp.* at 200.]

Moreover, the son testified on deposition that he knew that he was disobeying his father in allowing the driver to borrow the car. The court concluded:

Obviously, therefore, [the son] did not believe that the ensuing use was with his father's consent. Defendants have failed to show any conduct by [the father] which would warrant a belief that [the driver's] use of the car in the early morning hours of December 6, 1986 was with the "implied consent" of [the father]. See *Volk v. Cacchione*, 395 Pa. 636, 150 A.2d 849 (1959); *Beatty v. Hoff*, 382 Pa. 173, 114 A.2d 173 (1955); *Federal Kemper Insurance Co. v. Neary*, 366 Pa.Super. 135, 530 A.2d 929 (1987); *Donegal Mutual Insurance Co. v. Eyler*, 360 Pa.Super. 89, 519 A.2d 1005 (1987); *Belas v. Melanovich*, 247 Pa.Super. 313, 372 A.2d 478 (1977); and *Helwig v. Esterly*, 205 Pa.Super. 185, 208 A.2d 10 (1965). [*Id.* at 201.]

■ Here, the proofs do not support a finding that there was a sufficient connection between the conduct of Dr. Fraire and the operation of the BMW by Brackin to warrant a reasonable belief that Brackin had implied permission to drive the car. Dr. Fraire did not expressly give Brackin or Alexiou permission to drive the BMW and, in fact, had never even met either of the boys prior to the incident in question. Moreover, Dr. Fraire had instructed Armando not to permit anyone else to drive the car, and when he saw Armando's companions driving the BMW north on the highway in Texas he (Dr. Fraire) tried to stop them. In our view, Brackin's possession of the car amounted to nothing short of "theft or the like," and cannot provide a sound factual and legal basis to imply coverage under the omnibus clause. *Cf. State Farm Mut. Auto. Ins. Co. v. Zurich Am. Ins. Co.*, 62 *N.J.* 155, 167 (1973); *Odolecki v. Hartford Acc. & Indemn. Co.*, 55 *N.J.* 542, 550 (1970); *Tooker v. Hartford Acc. and Indemn. Co.*, 128 *N.J.Super.* 217, 221–222 (App.Div.1974). This conclusion is strengthened by Alexiou's telephone call to Armando requesting that charges be dropped in exchange for the return of the BMW. This is clear evidence that the boys

knew that Brackin did not have expressed or implied permission to drive the car from Mexico to New Jersey.

Thus, we hold that the application of Pennsylvania case law, the *Motorists Mutual* case in particular, leads to the inescapable conclusion that Brackin did not have permission to use the car and was not an additional insured under the omnibus clause of the Allstate policy. The trial court's conclusion to the contrary clearly is mistaken and so plainly unwarranted that the interests of justice demand our intervention and correction. *State v. Johnson*, 42 *N.J.* 146, 162 (1964). *See also Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484 (1974); *Formosa v. Equitable Life Assurance Society*, 166 *N.J.Super.* 8, 20 (App.Div.1979), certif. den., 81 *N.J.* 53 (1979); *Fagliarone v. Tp. of No. Bergen*, 78 *N.J.Super.* 154, 155 (App.Div.1963), certif. den., 40 *N.J.* 221 (1963).

■ Furthermore, even if we were to make the dubious assumption that there was some connection between Dr. Fraire's conduct and the operation of the car by Brackin that reasonably would warrant a finding that Brackin had implied permission to use the BMW (which this record does not support), we have no hesitancy in holding that the scope of any such implied permission was exceeded by Brackin. Pennsylvania applies the "material deviation" standard to such situations. "[C]overage to an omnibus insured will be extended if the driver's deviation from the named insured's permission is slight and inconsequential, but not if it is substantial." *Gen. Acc. Ins. Co. of Am. v. Margerum*, 375 *Pa.Super.* 361, 364, 544 *A.*2d 512, 513 (1988). *See also Exner v. Safeco Ins. Co.*, 402 *Pa.* 473, 477–78, 167 *A.*2d 703, 705 (1961); *Freshkorn v. Marietta*, 345 *Pa.* 416, 419, 29 *A.*2d 15, 17 (1942); *Helwig v. Esterly*, 205 *Pa.Super.* 185, 189–91, 208 *A.*2d 10, 12 (1965).

In *Freshkorn*, the driver borrowed a car to go from Rochester to Freedom in Pennsylvania. After dropping off a passenger in Freedom, the driver continued on to Ambridge, a

town seven miles beyond Freedom. On the driver's return trip, between Ambridge and Freedom, an accident occurred. In reversing a judgment against the owner's automobile liability insurer, the Pennsylvania Supreme Court stated that " 'slight and inconsequential deviations will not annul the coverage of the omnibus clause,' but here there was not a slight deviation but a new journey wholly independent from, and additional to, that for which permission was granted...." *Freshkorn,* 29 *A.*2d at 17 (quoting *Laroche v. Farm Bureau Mut. Auto. Ins. Co.,* 335 *Pa.* 478, 480, 7 *A.*2d 361, 362 (1939)). The court in *Freshkorn* concluded:

> The court should have instructed the jury that, even giving to plaintiffs the benefit of the most liberal construction that could reasonably be placed upon the conversation between [the insured] and [the driver], the car was not being operated at the time of the accident in accordance with the permission given by the insured, and therefore the insurance company was not liable on its policy. [29 *A.*2d at 17.]

Here, the proofs show that Brackin's deviation from the scope of any assumed implied permission was material and substantial. Dr. Fraire's attempt to stop Brackin when he was in Texas and, thereafter, Alexiou's call to Armando to ask him to drop the charges in exchange for the return of the car stand in stark contrast to a finding that Brackin's possession of the car in New Jersey was within the scope of permission that reasonably could be implied in the circumstances of this case. Rather, Brackin's conduct in taking the BMW from Mexico to New Jersey was a material and substantial deviation from any implied permission and, consequently, we hold that Brackin was not an additional insured within the omnibus clause of the Allstate policy and was not entitled to the protection afforded thereby.

Accordingly, the judgment under review is reversed and judgment is entered in favor of Allstate, whose Automobile Liability Insurance Policy did not provide coverage to Brackin for any claims arising out of the New Jersey accident.